WILLIAM RUDOLPH SITTIG et al. v. HENRY KERSTING et al., Appellants.

Division Two, July 16, 1920.

1. **MOTION TO STRIKE OUT:** Waiver. By filing their answer the defendants waive for purposes of appeal their prior motion to strike out parts of the amended petition.

Sittig v. Kersting.

2. **WILL CONTEST: Incapacity: Question for Jury.** The testatrix was ninety-three years of age when her will was made, three years prior to her death; without cause she had turned violently against her only son, who had become insane and was then in the hospital, and wanted to disinherit him; she became hostile towards some of her nephews and nieces, who had previously been on friendly terms with her; by the time the will was drafted her mind had become so hostile towards these relatives that she declared she did not want them to have the dirt under her finger nails; she directed that one thousand dollars be bequeathed to "the children of my sister named Schimpf" residing in Germany, when there was testimony that she had no sister by that name; and the medical expert left the question of *senile dementia* in uncertainty. *Held,* that the question of her testamentary capacity was for the jury.

3. ———: **Undue Influence: Question for Jury.** By her will the testatrix gave one thousand dollars to the children of a sister residing in Germany, one dollar to a nephew, five dollars to a niece, the income from the residue to her only son, and the remainder to a man and woman who were in no wise related to her; the son at the time was fifty-six years of age, was insane and confined in a hospital; he owned about $40,000 in bonds, and died after her will was made, and the property she bequeathed was acquired from him; there was testimony tending to show that at and prior to its execution, this man and woman were in full control, not only of the feeble body of testatrix, who was ninety-three years of age, but also of her property rights; that this woman assisted in poisoning the mind of testatrix against her nephews and nieces, and did not extend a welcome to them when they attempted to visit her, as would have been natural had her only motive been to serve as attendant at the sick bed; and that the man was not inclined to take these relatives into his confidence concerning her property affairs. *Held,* that these, and the other circumstances, made the question of undue influence one for the jury.

3. ———: ———: **Evidence: Proceeding in Probate Court.** Where practically all of the property bequeathed by testatrix's will came to her as either claimant against her insane son's estate after the will was made or as his heir after his death, and her affairs were so closely interwoven with his estate that it is impossible to understand the circumstances surrounding the one without a showing of what was done with the other, the records and proceedings in the probate court concerning the establishment of the claim against the son's estate, the appointment of one of the legatees as curator thereof, and the administration and management of the son's estate by said legatee after the son's death, are all admissible evidence on the issue of undue influence.

4. ———: ———: ———: **Distribution Prior to Death.** Evidence that the aged testatrix, after her will was made, divided the greater portion of her personal bequests, amounting to nearly $40,000, among the two unrelated legatees to whom she had bequeathed it, in order to avoid the adverse results of an apprehended contest of her will, is admissible on the theory that it was a part of a general scheme to influence her to dispose of her property, and as an aid to the jury in determining what was the motive and conduct of said legatees at and prior to the making of the will.

5. ———: ———: **Burden on Proponents: Fiduciary Relation.** The general rule is that the burden is on contestants to prove that the will is the product of undue influence, but where the evidence discloses a fiduciary relation between the legatees and the testatrix the burden is upon them to prove that it was not the result of undue influence; and where the facts showing the fiduciary and confidential relations are admitted by the legatees, and establish such relation as a matter of law, it is not error to instruct the jury that the burden is on them to prove that the paper is the "valid will" of said testatrix.

Appeal from St. Louis City Circuit Court.—*Hon. Benjamin J. Klene,* Judge.

AFFIRMED.

*O. J. Mudd* for appellants; *John M. Wood* of counsel.

(1) The testimony relied on to show mental unsoundness to the degree of testamentary incapacity is lacking the requisite substance and probative force to overcome the presumption following the formal proofs, and that issue should have been withdrawn from the jury. Cash v. Lust, 142 Mo. 630; Winn v. Grier, 217 Mo. 444; Hughes v. Rader, 183 Mo. 705; Hahn v. Hammerstein, 272 Mo. 258; Gibney v. Foster, 230 Mo. 131. (2) The belief which is shown to have been entertained by Mrs. Wolf shortly after making her will, that the activities and efforts of plaintiffs towards her sprang from a desire to get her money rather than a disinterested humanity cannot be made the basis of a claim

of insane delusion. It may be a mistaken judgment, but, being based on facts, it could not become what, in the law, is an insane delusion. Fulton v. Freeland, 219 Mo. 517; Connor v. Skaggs, 213 Mo. 348; Jackson v. Hardin, 83 Mo. 183. (3) The evidence is insufficient to warrant the submission to the jury of the issue of undue influence, and the court should have given the peremptory instruction directing a verdict for the will. Cash v. Lust, 142 Mo. 630; Fulton v. Freeland, 219 Mo. 520; Weston v. Hanson, 212 Mo. 270; Teckenbrock v. McLaughlin, 209 Mo. 543; Tibbe v. Kamp, 154 Mo. 580; Carl v. Gabel, 120 Mo. 283; Berberet v. Berberet, 131 Mo. 399; Doherty v. Gilmore, 136 Mo. 414; McFadin v. Catron, 138 Mo. 223-4; Luebbert v. Brockmeyer, 158 Mo. App. 196; Turner v. Butler, 253 Mo. 217; Turner v. Anderson, 236 Mo. 534. Proof of an interest in the result of the exercise of undue influence over a testator in making of a will, coupled with an opportunity on the part of a beneficiary under the will to exercise such influence, is not sufficient proof to take the issue of undue influence to the jury. Luebbert v. Brockmeyer, 158 Mo. App. 196; Teckenbrock v. McLaughlin, 209 Mo. 550. (4) Undue influence may not be shown so as to overthrow a will from the acts or conduct or declarations of one of several devisees under the will, done or made after the execution of the will, and so the acts and declarations of Boettler, done or made in the probate court in his capacity of guardian and administrator, even if sufficient to show undue influence as against himself, would not be competent as against the other devices who were wholly strangers to such acts and declarations, and are not even shown to have known of them. Teckenbrock v. McLaughlin, 209 Mo. 540; Schierbaum v. Schemme, 157 Mo. 1; King v. Gilson, 191 Mo. 333; Seibert v. Hatcher, 205 Mo. 101. (5) The burden of proof was not on defendants to prove that the will proposed was a "valid will." For to be a "valid will" it must not have been the result of undue influence, and

as to this issue, the burden was on plaintiffs as con-
testants who made the charge of undue influence. Carl
v. Gable, 120 Mo. 295; Aylward v. Briggs, 145 Mo. 613;
Schierbaum v. Schemme, 157 Mo. 12; Turner v. Butler,
253 Mo. 217. (6) Although there be evidence tending to
prove facts which would in law create a confidential re-
lation, such evidence, the facts themselves not being ad-
mitted, would not impair the rule that the burden of
proving this issue is on contestants. It would only be
a method or means of meeting that burden. Doherty
v. Gilmore, 136 Mo. 414. The burden of proof in a law-
suit is fixed by the pleadings, and when the plaintiffs in
a will contest charge in their petition the exertion by
one of the beneficiaries under the will of undue influence
in the making of the will, and that charge is denied in
the answer, the burden of proving the charge is on the
plaintiffs, and remains there throughout the trial, not-
withstanding the appearance in the case of evidence
tending to show a confidential relation to the testator on
the part of a beneficiary under the will, unless and until
the evidence thus appearing and tending to prove such
confidential relation so conclusively establishes that re-
lation as to authorize the court, as a matter of law, to
find and declare the fact of such relation. It is only
when the relation is so proven, or when it is admitted,
that the court should charge that the burden of proof
rests upon the proponents. Bunker v. Hibler, 49 Mo.
App. 542; Link v. Jackson, 158 Mo. App. 86; Norton
v. Paxton, 110 Mo. 461; Schaefer v. Railroad, 128 Mo.
71; O'Shea v. Lehr, 182 Mo. App. 693; Berger v. Stor-
age, Co., 136 Mo. App. 41; 16 Cyc. 926, 932, 934. (7)
Clearly the testimony brought into the case over the
objection and exception of defendants showing the divi-
sion of her property made by Mrs. Wolf in May, 1916,
three years after the making of the will, was too remote
to show either testamentary incapacity at the time, or
undue influence in the act of making the will was too
remote. But it was very damaging to the defense.

Wiggington v. Rule, 275 Mo. 448. (8) As the case was submitted to the jury on both issues, testamentary incapacity and undue influence, and we cannot know on which issue (if either) the jury found against the will, then, if the evidence is insufficient as to either issue, the judgment must be reversed. Luebbert v. Brockmeyer, 158 Mo. App. 196. (9) Declarations made by the testatrix after the making of the will are hearsay and incompetent. Schierbaum v. Schemme, 157 Mo. 76; Teckenbrock v. McLaughlin, 209 Mo. 549; Hayes v. Hayes, 242 Mo. 170.

*Douglas W. Robert* for respondents.

(1) The will itself sufficiently proved the testatrix to be on unsound mind. She did not know who "the children of my sister named Schimpf" were. This will, therefore, falls within one of the cardinal rules for testing testamentary capacity. Turner v. Anderson, 260 Mo. 1.; Wendling v. Bowden, 252 Mo. 647; Teckenbrock v. McLaughlin, 209 Mo. 533; Mowry v. Norman, 204 Mo. 173; Hamon v. Hamon, 180 Mo. 701; Sehr v. Lindeman, 153 Mo. 276. There was ample evidence *dehors* the will to show mental unsoundness, such as the delusions she possessed, which Dr. Mueller, defendant's expert witness, testified were evidence of *senile dementia*. When there is any such evidence and the issues are properly submitted to the jury, the verdict is conclusive on appeal. Turner v. Anderson, 260 Mo. 1; Byrne v. Fulkerson, 254 Mo. 97; Winn v. Grier, 217 Mo. 430; Hayes v. Hayes, 242 Mo. 155; Wendling v. Bowden, 252 Mo. 647; Teckenbrock v. McLaughlin, 209 Mo. 533; Sehr v. Lindemann, 153 Mo. 288. (2) The delusions existed before the making of the will, as appears from the testimony of the three defendants, Boettler, Schmiedeke and Kersting. Evidence of the delusions, such as were testified to, was sufficient to make the question one for the jury. Wiggington v. Rule, 205 S. W. 168. (3)

There was sufficient evidence of undue influence in the actions and words of defendants Boettler and Schmiedeke to take the case to the jury. In addition to this both defendants were in confidential relations to Mrs. Wolf; hence the burden was upon them to show lack of undue influence. Kleinlein v. Krauss, 209 S. W. 933; Cornet v. Cornet, 248 Mo. 184-236; Bradford v. Blossom, 207 Mo. 177; Dausman v. Rankin, 189 Mo. 677; Studybaker v. Cofield, 159 Mo. 596; Carl v. Gabel, 120 Mo. 283; Gay v. Gilliland, 92 Mo. 250; Cadwallader v. West, 48 Mo. 483; Hall v. Knappenberg, 97 Mo. 509; Bogie v. Nolan, 96 Mo. 85; McClure v. Lewis, 72 Mo. 314; Ford v. Hennessy, 70 Mo. 580; Bradshaw v. Yates, 67 Mo. 221; Street v. Goss, 62 Mo. 226; Yosti v. Langhran, 49 Mo. 594; Parker v. O'Brien, 181 Mo. App. 487; Caspari v. First Church, 12 Mo. App. 293, 82 Mo. 649. If the will was the product alone of the undue influence of Boettler, the confidential business man and adviser, this would render it void as to all other devisees as well. Teckenbrock v. McLaughlin, 209 Mo. 533; Hamilton v. Armstrong, 120 Mo. 597; State v. Curtis, 70 Mo. 594; Ranken v. Patton, 65 Mo. 378; Yosti v. Laughran, 49 Mo. 594; Miller v. Simonds, 5 Mo. App. 33. Undue influence need not be directly proved. It can be shown by facts and circumstances surrounding the transaction. King v. Gilson, 191 Mo. 307. (4) No "declaration" of either Boettler or Schmiedeke against the will was offered in evidence, hence the rule that the declaration of one devisee against the validity of the will cannot be received against another, does not apply. All that was shown was the acts of both defendants in procuring the will to be made in their favor. But in addition to this a conspiracy between Boettler and Schmiedeke was pleaded and proved and when this is done even their declarations are admissible. Teckenbrock v. McLaughlin, 209 Mo. 533; Meier v. Buchler, 197 Mo. 68; Cowan v. Shaver, 197 Mo. 203; Schierbaum v. Schemme, 157 Mo. 1. (5) The burden of proof was upon the defend-

ants to prove Mrs. Wolf of sound mind. Major v. Kidd, 261 Mo. 607; Carl v. Gabel, 120 Mo. 283; Norton v. Paxton, 110 Mo. 456; Benoist v. Murrin, 58 Mo. 307. Confidential relations having been shown, the burden of proof was upon the defendants to show that the will was free of their undue influence. Cases cited under Point 3. (6) Evidence prior or subsequent to the making of the will is admissible to aid in determining the testator's condition at the time of making the will, especially where there was no noticeable change in condition. And this is particularly admissible when conspiracy and undue influence is charged and shown as a continuing act. Wigginton v. Rule, 205 S. W. 168; Byrne v. Fulkerson, 254 Mo. 97; Buford v. Gruber, 223 Mo. 231; Winn v. Grier, 217 Mo. 450; Story v. Story, 188 Mo. 110. (7) Declarations of the testatrix after the will was made are competent and if defendants had desired the effect of the evidence to be limited they should have offered an instruction to that effect. Lefever v. Stephenson, 193 S. W. 840; Teckenbrock v. McLaughlin, 209 Mo. 533; Garesche v. College, 76 Mo. 332; Woods v. Railroad, 51 Mo. App. 500.

WILLIAMS, P. J.—This is a suit to contest the will of Katharina Wolf, on the grounds of mental incapacity and undue influence. Plaintiffs are the nephew and niece and the children of a deceased niece of the testatrix. The defendants, Frederick Boettler and Mamie Schmiedeke, who were in no way related to testatrix, receive by the will nearly all of the property. Henry Kersting, the remaining defendant, was the attorney who drafted the will and is named as executor therein. Trial was had in the Circuit Court of the City of St. Louis before a jury, which resulted in a judgment setting aside the will. Defendants duly appealed. The material facts may be summarized as follows:

The alleged will was executed on June 20, 1913. The will was written in the German language. A true translation of the will in English is as follows:

"I, Katharina Wolf, declare the following as my last will and testament:

"I bequeath one thousand ($1,000) dollars to the children of my sister named Schimpf, residing in Lembrecht on the Hardt, near Neustadt, in Germany, the same to be divided among them share and share alike.

"I bequeath five ($5) to Mrs. Louisa Spaete; also one ($1) to Rudolph Sittig.

"I bequeath herewith to my son, Edward Wolf, the income from all remaining property which I may possess at the time of my death. The property itself I bequeath in equal parts to Mrs. Schmiedeke and Frederick Boettler because she has earned it by me, and because Mr. Boettler has been my best friend and benefactor.

"I name Attorney Henry Kersting as executor, under suitable bond.

"Executed in St. Louis, Mo., on the 20th day of June, 1913.

"Katharina Wolf.

"This testament was personally above subscribed by Katharina Wolf, and she declared the same as her last will and testament, in our presence, and we have, in conformity with her wish, and in her presence, and in the presence of each other, subscribed this instrument as her last will and testament. We further certify that the testatrix, Katharina Wolf, is at present of sound mind.

"LUCILLE ROEGER,
"LIZZIE ROEGER."

At the time of the making of the will testatrix was 93 years of age, and had been confined to her bed for more than a year as the result of injuries received from a fall. She lived at 1709 Geyer Avenue in St. Louis, which home belonged jointly to herself and to her only son Edward Wolf. Testatrix had no other children and her husband had been dead for over thirty years. The son Edward was 56 years of age and at different times

in his life had been engaged in the roofing business, real estate business, and later in the bond business, and had accumulated approximately $40,000 worth of property in the form of bonds. The testatrix had not been engaged in any business.

Just a few weeks prior to the execution of this will the son of the testatrix became insane and was taken to a hospital.

Defendant Boettler had been a friend of Edward Wolf since boyhood and by reason of that association was acquainted with testatrix.

Defendant Mrs. Schmiedeke, together with her husband and children, moved into a house on the rear of the lot where testatrix lived about the year 1905. After testatrix received the injuries from the fall in 1912, Mrs. Schmiedeke waited upon testatrix and had her constantly in charge until the death of testatrix, which occurred October 3, 1916.

The evidence upon the part of the plaintiffs tends to show that up until about the time the will was made, two of the plaintiffs, a Mrs. Spaete (niece) and a Mr. Sittig (nephew), frequently called upon the testatrix, as had also a Mr. Ludwig, who at one time had married another niece of the testatrix; that the relations between testatrix and her relatives were cordial and that there had been no difficulty between them.

Shortly after Edward Wolf was taken to the hospital, defendant Mrs. Schmiedeke called upon defendant Mr. Boettler and informed him that testatrix desired him to come to her house. He immediately complied with the request, and according to his testimony found testatrix in bed. Testatrix said: "Mr. Boettler, now I am in an awful fix, my Eddie has taken every cent I have got and now he is crazy and is sick in the hospital. He took every cent I have. What will I do now? He left me in an awful fix." The testatrix asked him what could be done, and that he advised her to get a lawyer. He advised her to get a lawyer who could

speak German, so she could talk to him.   In compliance
with that request she secured the service of Mr. Kerst-
ing, one of the present defendants.   Prior to this time
the witness did not know the attorney, but the attorney
was procured upon the advice of witness's brother.   The
witness took the attorney down to the home of testa-
trix, where a consultation was had, advising her to have
defendant Boettler appointed as curator of the estate
of Edward Wolf, insane.   Complying with the request
of the testatrix defendant Boettler and the attorney
brought proper proceedings in the probate court, and
in May, 1913, Boettler was appointed curator of said
estate.   The account filed by Boettler as the curator of
the estate of Edward Wolf, insane, showed assets total-
ing $39,734.04.   The greater portion of these assets was
in the form of municipal bonds.

On June 14, 1913, a claim was filed in the probate
court against the estate of Edward Wolf, insane, by the
testatrix; said claim was for the sum of $17,500, and
was based on an alleged advance by testatrix to her son
for the sum of $500 per year for a period of thirty-five
years.   The claim of testatrix was prepared and filed
by an attorney recommended either by defendant Boet-
tler or by Mr. Kersting.   On the day the claim was set
for hearing defendant Mrs. Schmiedeke appeared and
testified for the claimant, but it does not appear that
claimant was present or that her deposition was offered.
Little defense, if any, was made to the claim.   The claim
was allowed by the probate court on June 26, 1913.   This
claim was filed in the probate court on June 7, 1913.

The will involved in this suit, as stated above, was
executed June 20, 1913.   The will as above set forth left
the income from her property to her son Edward for
life and the greater portion of her property was divided
into equal parts to defendants Boettler and Schmiedeke.
The will provides that one thousand dollars be left "to
the children of my sister, named Schimpf residing in
Germany."   The evidence shows that the testatrix was

born in Germany and that her maiden name was Schimpf. One of the plaintiffs testified that testatrix had no sister named Schimpf living in Germany at the time the will was made.

At the time the will was signed defendants Boettler and Schmiedeke were present in the room, as was also the attorney who was named as executor in the will. The only other witnesses were two ladies named Roeger. One Mrs. Roeger was a tenant of the testatrix. The attorney who drew the will testified that defendant Boettler told him to go down to see the testatrix about making a will. He complied with the request, and the testatrix told him how she wanted to dispose of her property. The attorney suggested to the testatrix that he thought that she ought to remember her relatives in her will, but testatrix said: ''I don't want to leave that bunch even as much as the dirt under my finger nails.'' The lawyer went to his office to prepare the will, and returned the next day, at which time testatrix said she had changed her mind to a certain extent; that when she was talking of her relatives she did not mean to include the Schimpf children in Germany, and that she wanted them to have one thousand dollars.

Although the testatrix had told the attorney that she did not want to give her other relatives anything, the attorney inserted a provision giving five dollars to a Mrs. Spaete, a niece and one dollar to a nephew Mr. Sittig. He says the testatrix objected to this provision, but he advised her that it would look better to leave it in and that she finally consented.

It further appears that defendant Boettler had had prior talks with testatrix about her will. He testified that testatrix became very angry towards her son Edward, claiming that he had placed property which had belonged to her in his name; that the testatrix wanted to make a will and disinherit her son altogether, and wanted to give her property to himself and Mrs. Schmiedeke, but that he talked to her and told her that her son

was insane and was not entirely responsible and that she should provide for the son in the will and that if she "insisted" on giving something to him and Mrs. Schmiedeke she should give them "only what is left." The witness says that finally the testatrix thought "I was right."

On July 8, 1913, defendant Boettler, as curator of Edward Wolf, insane, made application to the probate court for an order permitting him to sell sufficient of the bonds of the estate to pay the claim of $17,500, which had been theretofore allowed to testatrix. The order was granted, but Boettler did not make sale of the bonds, but instead he testifies that he took some of the bonds out and showed them to the testatrix and she told him to "take charge of them," which he did by placing them in a safety-deposit box, which was rented in the name of Wolf in a down town trust company. Defendant Boettler carried the key to this box. At about that time or shortly thereafter and on, to-wit August 11, 1913, defendant obtained from the testatrix the following power of attorney:

"St. Louis, Mo., August 11, 1913.

I, Katharina Wolf, the undersigned administratrix, do hereby appoint Frederick Boettler as my agent, confidential man and administrator with full power to act in all my private and business affairs in the same way as I myself in my own person would have done, and especially do I authorize the said Mr. Frederick Boettler to take possession of all my papers of value such as stocks, bonds and similar papers, and to do with them just as I would do with them if I had been capable of doing, and he need not give account to any one for his acts.

Done and signed by me with my own hand at St. Louis, Mo., on this 11th day of the month of August, 1913, at my residence at 1709 Geyer Avenue.

KATHARINA WOLF.

"Witness:
    "MISS LIZA ROEGER,
    "MAMIE SCHMIEDEKE."

About four months later defendant Boettler told the family physician of the testatrix, Dr. Hendrick, that

he had heard that the relatives of the testatrix were going to "make a contest" or "were trying to declare her of an unsound mind," and that he wanted the family physician to procure a doctor who was a specialist on nervous diseases and have him go out and examine testatrix as to her mental capacity.

Dr. Mueller was obtained for this purpose, and made the examination. He testified at the trial that her mind was "as sound as one might expect in a person of her age;" that he conversed with her, that he did not detect any flaw in her memory, and that he did not find any serious defects in her mentality. He said he did not find any evidence of "senile dementia." He said: "Senile dementia is a form of insanity which occurs in very old people where the memory and judgment become very defective; they usually have certain delusions as to the objects of other people towards them, and are unusually suspicious, morbidly suspicious, and very often they suspect certain people of interfering with their rights, and as a rule they are quite insane." Upon cross-examination the doctor testified that he did not recall whether he talked to testatrix about her relatives and "if this woman had told me that her nieces and nephews and grand-nieces and grand-nephews were coming about her trying to get her money away from her and that her only son had taken all her property, I would feel like inquiring further in the case, certainly."

Edward Wolf, insane, died in December, 1914, and defendant Boettler was appointed administrator of his estate and filed an inventory showing bonds and personal property belonging to the estate of the value of approximately $20,000. Later defendant Boettler, as administrator of the estate, filed his final settlement, which stated that on March 10, 1916, he had distributed $19,580.95 of the assets of this estate to testatrix. It appears that bonds to this amount were placed by defendant Boettler in the safe-deposit box, with the other bonds belonging to testatrix which he held under the

arrangement as above stated. Shortly after the estate
of Edward Wolf was settled, and some time in the spring
of 1916, there were present one Sunday at the home of
testatrix defendants Schmiedeke and Boettler, and one
other person whose name is not disclosed. On this occa-
sion the question arose as to the likelihood of the rela-
tives of testatrix contesting the will. Some one in the
crowd said: "Oh, Mother, as soon as you die they will
be in the courts fighting your will." There was evidence
to the effect that the defendant Mrs. Schmiedeke always
called testatrix "mother," but defendant Boettler states
that it was not Mrs. Schmiedeke who thus spoke on this
occasion, but that defendant Schmiedeke said that "she
had no money to go to court on such an occasion;" that
the testatrix said nothing for awhile and finally turned
to the witness and said, "Mr. Boettler, can they do
that?" To which he replied, "Yes, sure they can."
Thereupon testatrix asked the witness what could be
done and he replied that he did not know, that the only
thing to do was to ask the lawyer and the testatrix re-
plied, "Ask him." The witness testified that he went
to see a lawyer and the lawyer advised her to divide the
property. He told testatrix what the lawyer said, and
she said, "You go down and get these papers and divide
them and give them to me and I will divide them with
you and Mamie" (Mrs. Schmiedeke). This request of
the testatrix was complied with, and the attorney came
out to the house and the bonds were brought out to the
home of the testatrix, and were divided and placed in two
different packages, and then turned over to the testatrix,
and thereupon testatrix gave the package containing half
of the bonds to Mrs. Schmiedeke and the other half to
defendant Boettler. Defendant Boettler says he was
"rather excited" at the time and "could not tell every
word that transpired" but that she said, "Mr. Boettler,
you will see that I am taken care of; you have always
been a friend and this is for you." The witness states
that the testatrix did not give away her whole fortune

of $37,000 in this fashion, but that "I kept some back against her say so." He does not state how much, except that it was more than $1200. At another place in his testimony this witness said: "That did not leave her broke again. She had my promise to attend to everything that she would need. I suppose what she did was that she gave Mrs. Schmiedeke and me $37,000 worth of bonds for my promise."

Defendant Mrs. Schmiedeke testified, admitting that she was present when the bonds were divided. She testified that she had paid the testatrix rent up until this division was made and further said, "I quit paying rent when she made that division" and "she [testatrix] says she never wanted to take any rent" and I says, "No, you take my rent, I want to be honest; I didn't want to live that way, you know."

This witness further testified that she had never seen any of the relatives of the testatrix visit her between 1905 and 1912 and that none of them undertook to visit testatrix so far as she knew until about August, 1913. She denied that she had done anything to prevent relatives from seeing testatrix when they called, or that she had done anything to cause ill feeling to exist. She testifies that upon one occasion in 1913 testatrix drew an unloaded pistol on one of the relatives and ordered them out of the house, and threw a glass of milk in the face of another. And she admits that one of the relatives at one time said to her, the witness, "You G,—d—s— b—, you get to hell out of here," and the witness replied, "I am taking care of this woman, I have been here for years," and thereupon testatrix spoke up and said to the witness, "You stay right here." That on this occasion the relative asked testatrix where her money was, and that testatrix told him that it was in the cellar in the ground, "go down and dig it up if you want to." Mrs. Schmiedeke testified that she never suggested that testatrix make a will, and that although she knew when the will was made she was not in the room

when the will was made, and did not know the contents of the will until after testatrix' death. The proponents of the will introduced in evidence the testimony of a minister who had frequently visited testatrix prior to her death and some neighbors, who testified in effect that testatrix had sound mind up until a day or two before her death.

The attorney who drew the will testified that "her mind was absolutely clear; in fact, I thought that for a woman of her age her mind was remarkably clear. If you could use an illustration, I would say that it was as clear as the clearest water. Her reason was absolutely perfect; she struck me as a woman who had a remarkably strong and positive will, very positive."

Defendant Mrs. Schmiedeke testified that while she waited on the testatrix constanty after she was injured, she never received any compensation for her work, but testatrix frequently said that she would provide for her.

Plaintiffs introduced evidence tending to show that one of them investigated the probate court records shortly after Edward Wolf was declared insane, and noticed that the testatrix had been allowed the claim of $17,500 against the estate, and in order to see that her property was being properly handled called upon testatrix and asked about the matter; that she became very angry and ordered them out of the house. Some of the relatives of the testatrix testified that they noticed a change in the mental condition of the testatrix shortly after the St. Louis cyclone in 1896. One of the plaintiffs, Mrs. Spaete, testified that she frequently called upon her aunt until about June, 1913, whenever she had a chance, that she was always welcome, and that her relations with her aunt during all these years were pleasant; that she frequently took the children with her on these visits; that after the cyclone and up until 1913, there were occasions when testatrix did not know the witness, but the witness would remind her who she was and then testatrix would remember her; that about a year before her aunt died she

pointed a pistol at the witness and ordered her to get out, which the witness did. Witness offered at one time to go down to her aunt's and help take care of her, but Mrs. Schmiedeke says, "I don't want you."

One of the nephews, Mr. Chas. C. Dietz, testified that when he first heard that his cousin, Edward Wolf, was in the hospital, he went down to see him, and two days thereafter he went down to see his aunt and that he saw there Mrs. Schmiedeke taking care of his aunt and asked her (testatrix) where Ed. was and she said "she didn't know he went away." Mrs. Schmiedeke told his aunt that the name of the visitor was Dietz, and testatrix said, "I don't know such a party," and witness then said, "Don't you know my mother, Charlotte Dietz?" and testatrix studied for a few minutes and then said, "No, I never knew such a person," and then the witness said, "Don't you know Aunt Louis, Mrs. Spaete, my mother's sister?" and she says, "I don't remember those people." The witness stated that in his judgment she was then of unsound mind.

A week later this witness and a Mr. Ludwig called to see testatrix. Testatrix did not recognize Mr. Ludwig until Mrs. Schmiedeke told her his name. It appears that Mr. Ludwig had at one time married a niece of testatrix, but the niece died prior to this time. Mr. Ludwig told testatrix that he had come down to see her, and wanted to know whether her things were being taken care of and looked after, and testatrix told him that defendant Boettler "was looking after that." Mr Ludwig then asked what had become of the $17,500. Thereupon defendant Mrs. Schmiedeke immediately jumped up and appeared to be very hostile towards Mr. Ludwig and said, "I don't want you to excite Mrs. Wolf, I don't want you to excite her, I don't want you to make her sick." Thereupon Mr. Ludwig said he would like to have her step into the next room a minute, and Mrs. Schmiedeke said "she didn't have to," but said to the testatrix, "They are trying to stir up a fuss with you,"

and immediately the testatrix became excited and said, "I don't want no fuss in this house; I don't want you to come around here and start any fights and fusses; you get out of my house." This witness stated that testatrix did not seem to be taking "any particular interest in what was going on," until Mrs. Schmiedeke spoke, and that thereafter she became excited.

Another one of the nephews testified that he visited his aunt at intervals for many years prior to 1913; that he was a traveling man, and would go out to see his aunt whenever he was in town; that he went to see her quite often; that he noticed a change in her mental condition after the cyclone of 1896, in that she became more melancholy after that occurrence, and that some times she would not recognize him until after he had mentioned who he was and then she would say, "Oh, yes, you are Rudolph." The witness visited his aunt for the last time in 1914, at which time he was refused admittance to the house. He stated that he had called on his aunt between January 1st and June 20, 1913, and afterwards he heard that Eddie had become insane, and a few days thereafter witness went down to see his aunt to see if he could be of any assistance. As the witness approached the house Mrs. Schmiedeke came running out from the rear house in which she lived and asked witness what he wanted; the witness said, "Don't you know me?" and Mrs. Schmiedeke said, "Yes, I know you," and witness replied, " I want to see my aunt." Mrs. Schmiedeke said, "Well, I don't know; your aunt don't want to see anybody." After further conversation Mrs. Schmiedeke told witness to wait awhile and finally came out and let him in. Mrs Schmiedeke remained in the room and would answer the questions that the witness would ask his aunt. When the witness asked his aunt if she needed anything Mrs. Schmiedeke replied, "No, she don't need anything." The witness asked Mrs. Schmiedeke where Eddie was, and Mrs. Schmiedeke said Mrs. Wolf didn't want anybody to know where Eddie was, but that if he

284 Mo.—11

wanted to find out anything to go and see Mr. Boettler. The witness then called upon Mr. Boettler and Mr. Boettler told him that he was taking care of the estate and that he would see "that everything was all right" and that he was "taking care of the old lady's property." This was in the early part of June, 1913. This witness further testified:

"I went back down there to see Mrs. Wolf a few days after I seen Mr. Boettler and Mrs. Schmiedeke came out again, and she says, 'What do you want?' and I says, 'I have come to see my aunt,' and she says, 'Your aunt don't want to see any of her relatives; she don't want to see anybody;' and I says, 'I don't see why she refuses to see me; she was always pleasant to me and I always received a welcome from her,' and she says, 'Well, I will go see;' and she did go inside and stay in awhile and finally she did come in and left me in again and the old lady says, 'Who is that, who is that?' and she says, 'You know who it is; that is that Sittig.' 'What does he want?' 'You know what he wants; you know what he wants.' The old woman says, 'Tell him to get out.' 'You heard that from her own mouth; she wants you to get out, and if you don't get out I will get the policeman and have you put out.' That is what Mrs. Schmiedeke said. This visit that I have just spoken about was in the early part of June. The time when Mrs. Schmeideke told me to get out or that she would call a policeman and put me out, was about a few days or a week after I had seen Mr. Boettler, which was the beginning of June, some time in June; beginning of June. I did not have any conversations or any other visits to Mrs. Wolf between those two visits that I have described, but I went there again afterwards, and on this last occasion the old lady was in bed and Mrs. Schmiedeke asked again who it was. Mrs. Wolf would always say, 'Who is this?' 'You know who that is.' 'What does he want?' 'You know what he wants.' Mrs. Schmiedeke said that. She told me to get out, and took up a glass of milk and

threw it on me and I says 'All right, aunt; if you don't want me to call on you, I don't want nothing from you; I just came to see you; I will go,' and she says, 'You had better get out; if you don't, we will have a policeman.' Mrs. Schmiedeke said that. I went there after that round about in January again, of the next year. On this occasion—it was right after Christmas, the beginning of New Year's. I went down there and took a gentleman along with me to see if I could get to see her and talk with her, and I took her down some eggs and I knocked at the door and the door was locked, and I knocked at the door and Mrs. Schmiedeke opened the door and says, 'What do you want?' and I says, 'I come down to see my aunt,' and she says, 'Your aunt don't want to see you; she don't want to have anything to do with her relatives,' and I says, 'I have got some eggs for her,' and she shut the door and opened it again and says, 'Your aunt don't want your eggs; she says she don't want to have anything to do with you,' and she says, 'If you don't get out we will have a policeman take you out.' That gentleman whom I spoke of as taking down there was a Mr. Sadler. I did not get in that time. That was the last time I went there. I seen it was no use of going there when you can't get in.

"Q. Mr. Sittig, when you called on your aunt the last part of May or the early part of June, and saw her, was she of unsound mind? A. Well, she was kind of childish and didn't know, you know, and would take a long time; she would study and have a deep look and didn't answer your question; she was feeble-minded, old-aged.

"Q. Was she of sound mind? A. No; I wouldn't consider anybody of sound mind that would act the way she did."

I. We are unable to agree with appellants that the court erred in overruling their motion to strike out parts of the amended petition. After the motion to strike out had been overruled the movents filed answer.

**Motion to Strike Out.** The long established rule in this State is to the effect that by filing their answer they waived their right to urge this question upon appeal. [Fuggle v. Hobbs, 42 Mo. 537, l. c. 541; Walser v. Wear, 141 Mo. 443, l. c. 462; Dakan v. Mercantile Co., 197 Mo. 238, l. c. 270.]

Appellant while conceding that such is the case law of this State yet insists that the rule is wrong and should be changed.

In view of the fact that this exact question was but recently ruled against appellant's contention by Court in Banc in the case of Lewis v. Barnes, 220 S. W. 487, we feel that further discussion is now unnecessary.

II. Nor are we able to agree with appellants that the court erred in submitting the question of undue influence and testamentary capacity to the jury.

We think there was sufficient evidence to justify submitting both of these issues to the jury. Testatrix was 93 years of age when the will was executed. Apparently without cause she turned violently **Incapacity.** hostile toward her only son, who had become insane and was then in the hospital, and wanted to disinherit him; there was also evidence tending to show that without cause or reason she became hostile toward some of her nieces and nephews who had prior to that time been on friendly terms with her; by the time her will was drafted her mind had become so hostile toward these relatives that she declared she did not want them to even have "the dirt under her fingers nails." She directed that $1,000, be left by her will to "the children of my sister named Schimpf" whom she evidently thought were then living near the place of her birth in Germany; one of the witnesses, William Rudolph Sittig, testified however that testatrix had no sister by that name then living in Germany. When the above facts are considered in connection with the testimony of the appellants' own medical expert describing the symptons of senile dementia, we have no hesitancy in saying that

the evidence was sufficient to justify the submission of the question of testamentary capacity to the jury.

Likewise as to the evidence on the question of undue influence. There was evidence tending to show that at and prior to the time this will was made, the appellants Boettler and Schmiedeke were in full control not only of the feeble body of the testatrix but also of her property rights. There was testimony from which it might be inferred that Mrs. Schmiedeke assisted in poisoning the mind of testatrix against her relatives. She did not extend a welcoming hand to the visiting relatives as would have been the natural thing had her only motive been to serve as an attendant at the sick bed. Appellant Boettler was likewise not inclined to want to take the relatives into his confidence concerning the affairs of the stricken son. When the whole situation is carefully considered in connection with the fact that these two people occupying as they did close and confidential relations with the deceased, but not related by blood to testatrix, turn out to be the main beneficiaries in the will we have no hesitancy in saying that the question of undue influence was also a jury question. Under such circumstances, (e. g. the showing of the existence of a fiduciary or confidential relation), the law presumes the bequest was the result of undue influence and the burden is thus thrown upon the recipient of the bounty to show that it was not. [See cases hereinbelow cited.]

Undue Influence.

III. We are unable to agree with appellants' contention that the court erred in admitting in evidence (1) the records and proceedings in the probate court in the matter of the estate of Edward Wolf, an insane person, and also of the estate of the same person, deceased, and the actions and conduct of appellant Boettler in connection therewith; (2) the circumstances surrounding the division made by Mrs. Wolf of her property in May, 1916.

Probate Records.

Concerning point (1): The affairs of the testatrix were so closely interwoven with the estate of the insane son that it was impossible to understand the circumstances surrounding the former without showing what was done concerning the property of the latter. Practically all of the property of testatrix came to her as either claimant against the estate of her insane son or as his heir. The evidence concerning the son's estate throws vaulable light upon the circumstances surrounding testatrix, both before and at the time of the making of the alleged will. It also throws light upon the relation that existed between testatrix and appellants and the possible motives which may have actuated appellants Boettler and Schmiedeke, and we have no hesitancy in saying that it was all admissible on the issue of undue influence.

Concerning point (2): The evidence showing that testatrix in 1916, divided the greater portion of her property equally between appellants Boettler and Schmiedeke in order to avoid the adverse results of a suit to contest the will was also clearly admissible on the theory that it was part of a general scheme or plan to unduly influence the testatrix to dispose of her property. It was a circumstance which would aid the jury in determining what may have been the conduct and motive of these two appellants at and prior to the time the will was executed. Undue influence does not have to be proven by direct evidence. It may be proven by circumstantial evidence, and it is ofttimes necessary that the evidence take a wide range in order that the true situation surrounding the making of the will may be known.

Other objections are raised concerning the admission and rejection of evidence. We have carefully examined the matters of which complaint is made, but do not find any error therein which would justify a reversal.

IV. It is further contended that the court erred in instructing the jury that the burden was on the defendants to prove that "the paper read as being the will of

said Katharina Wolf is the *valid will* of said
Katharina Wolf.''

Burden:
Fiduciary
Relation.

Appellants while admitting that the burden
was on them to prove that the testatrix had
sufficient mental capacity to make a will, contend that as
to the issue of undue influence the burden was on the re-
spondents (contestants) and that this instruction erron-
eously placed it upon the appellants.

It is true that the general rule is that the burden
of proving undue influence in a will contest is upon the
persons alleging it. [Turner v. Butler, 253 Mo. 202, 1.
c. 217; Campbell v. Carlisle, 162 Mo. 634, 1. c. 644, and
cases therein cited.,] However, a well recognized ex-
ception to this rule exists to the effect that where the
evidence discloses a fiduciary relation between the bene-
ficiary and the testatrix, the burden is then upon the
beneficiary to prove that it was not the result of undue
influence. [Byrne v. Byrne, 250 Mo. 632, 1. c. 646; Mowry
et al. v. Norman, 204 Mo. 173, 1. c. 189.] In the Mowry
case, supra, GRAVES, J., speaking for the court said:

''Under ordinary circumstances the burden is upon
plaintiffs, throughout, to show undue influence, and upon
defendants to show mental capacity and the legal ex-
ecution of the will. However, if plaintiff shows a state
of facts which establish a fiduciary relation, or some such
similar confidential relation, between the defendant, a
principal beneficiary, and the testator, then upon that
showing the burden shifts,'' citing many cases. [Ib. 1. c.
189.] To the same effect are the following authorities;
Cornet v. Cornet, 248 Mo. 184, 1. c. 234-5-6, and the
numerous cases therein cited; Dausman v. Rankin, 189
Mo. 677, 1. c. 703; Hall v. Knappenberger, 97 Mo. 509,
1. c. 511. Whether this exception should apply only in
cases where the evidence is such as would justify the
court in holding as a matter of law that a fiduciary re-
lation existed, and in other cases only after the jury are
first required to find the existence of such fiduciary rela-
tion, we need not now determine. The point does not ap-

pear to have been clearly settled or much discussed by the authorities.

However, we have no hesitancy in applying it to the case at bar. The facts showing the existence of a fiduciary or confidential relation between testatrix and the two main appellants in this case are to be found as admitted facts in appellants' own testimony. And as to these facts there is no dispute. The facts which thus stand admitted upon this record are sufficient to justify the court in declaring as a matter of law that a fiduciary relation did exist between testatrix and appellants Boettler and Schmiedeke, and that being true the court did not err in instructing the jury that the burden was upon defendants to prove a valid will.

The judgment is affirmed. All concur.