IDA CLARK and ANGUS TURPIN v. PAT RUSSELL POWELL and NANCY POWELL, Appellants.—No. 38179.—175 S. W. (2d) 842.

Court en Banc, November 1, 1943.

Rehearing Denied, December 6, 1943.

1122

*Ira H. Lohman, Ralph Alexander* and *Sam W. James, Jr.* for appellants.

John D. *Taylor* and *William L. Nelson, Jr.*, for respondents; *Clark, Boggs, Peterson & Becker* of counsel.

WESTHUES, C.—This suit was filed in Chariton county, Missouri, to set aside a purported will, executed by Daisy Shannon, deceased, on grounds of mental incapacity and undue influence. The issue of mental incapacity was not submitted to a jury. Upon the question of undue influence the jury, by its verdict, set aside the will, and from the judgment entered the proponents appealed. The case was tried in Boone county, Missouri, having reached that court by a change of venue.

Daisy Shannon died at her home in Brunswick, Chariton county, Missouri, on April 15, 1941, at the age of fifty-nine years. The will in question was executed on March 25, 1941, at Jefferson City, Missouri. Daisy Shannon left no direct descendants. Her nearest relatives were a brother, Angus Turpin of Chicago, Illinois, and a sister, Ida Clark of Denver, Colorado. By the purported will the sister and brother were bequeathed personalty and a small house and lot in Brunswick, all of which property was valued at less than one thousand dollars. The will bequeathed to the defendants, Pat Russell Powell and his wife Nancy, a house and lot located in Jefferson City, Missouri, and personal property alleged to be worth in excess of eight thousand dollars. The Powells were not related to the testatrix.

We find it necessary to detail the circumstances leading to the acquaintanceship of the Powells and the testatrix because appellants contend the evidence was insufficient to sustain a finding of any confidential relationship between them. Daisy Shannon's home had been in Brunswick for many years. She had one daughter, Virlea, who died February 17, 1941, only about two months before her mother. Virlea lived with her mother until about the year 1924, when she married and moved to Jefferson City with her husband F. C. Heariold, who was employed at Lincoln University. About the year 1930, the defendant Powell and his wife moved to Jefferson City, next door to the Heariolds. Powell was an instructor at Lincoln University and a close friendship developed between him and his wife and the Heariolds. On several occasions Mrs. Shannon visited her daughter in Jefferson City and it was while there she met the Powells. Heariold died about the year 1938. During his illness the Powells rendered neighborly aid to the Heariolds and thereafter to Virlea in the form of advice and in taking care of the property left by her husband. The property in Jefferson City which was bequeathed to the Powells by the purported will was the property which the testatrix inherited from her daughter. After the death of Virlea's husband she returned to her mother's home and from thence went to school in Kansas City, Missouri. While attending school she became ill and died. During this time the Powells to a certain extent looked after her property located in Jefferson City and visited the testatrix at Brunswick. When the daughter was dangerously ill at Kansas City Powell advised the mother to have the bank account of Virlea changed to a joint account of Virlea and the testatrix. This, on the theory that the mother could then pay the necessary bills and in case of death pay expenses incurred without going to the probate court. After Virlea's death Powell was appointed administrator of her estate by the probate court of Cole county. The probate judge testified that he made this appointment because a letter had been presented to him, allegedly signed by Mrs. Shannon, asking the court to appoint Powell. The letter was in some way misplaced and was not introduced in evidence. Sam W. James, Jr., an attorney at Jefferson City with whom Powell had been

acquainted for a number of years, represented him in making application for appointment as administrator and thereafter in his administrative capacity. Powell as administrator, James as the legal advisor for the estate and the testatrix as the sole heir of the estate, had a number of questions and matters to settle with reference to the estate which gave rise to a number of meetings. On March 9, 1941, the administrator, James the attorney and Mrs. James drove to Brunswick to see Mrs. Shannon on business connected with the estate. At the trial Mr. James testified and it was also the contention of the defendants that while he was at the testatrix' home on that occasion she approached him about making a will; that he advised her he would rather [845] take notations as to her wishes with reference to the provisions and then take them to Jefferson City where he would carefully prepare the will. Mr. James testified that he did this and that on March 25, testatrix came to Jefferson City for some personal property of her daughter's estate, pursuant to an agreement reached on March 9, at Brunswick, and on that day she came to his office and executed the will in question. The notes taken by James while at Brunswick were introduced in evidence. Mrs. James testified that as they left the home of testatrix on March 9, Mrs. Shannon came to the car and the following occurred:

"Q. What was said in your presence on that Sunday in Brunswick, the 9th of March, '41? What discussion did you have with her about her business affairs? A. Well, she came out to the car and they were talking and she said, 'Mr. James, I am sorry that you won't draw my will here,' and he said, 'I would not attempt to, Mrs. Shannon,—I don't have a stenographer with me and I don't carry my typewriter with me. I will go back home, and on your next visit there you can come to the office and read it and see if it meets with your approval,—it will be there, ready for you.' "

The defendant Powell testified he never heard of Mrs. Shannon's will until March 25, when it was signed. He also stated that when they left Brunswick on March 9, he heard no conversation about the will as testified to by Mrs. James. Another witness for the defendants, Tom Smith, who was present at Brunswick, testified that he did not hear any such conversation. Powell testified in detail as to his business relations with the testatrix, and on the question of whether he was her advisor he stated as follows:

"Q. Now, Mr. Powell, did Daisy Shannon ever talk to you about what she wanted to do with that real estate over there after Virlea's death and what she wanted to do with the personal property? A. She didn't mention to me anything about disposition of her real estate.

"Q. I mean, the use of it,—about renting it or taking care of it. A. Oh, yes; she asked me, since I knew so much about the business and had looked after her son-in-law's business,—naturally, she looked forward for me to look after the renting of it, maintenance of it, and taking care of it, and what-not.

"Q. Has that property been rented over there? A. Yes, sir.

"Q. How much a month? A. It was started at $35 a month, and this spring it was raised $5,—to $40 a month.

"Q. Did you discuss at any time with Mrs. Shannon about having this property painted and fixed up so as to get more rent? A. Oh, yes, I discussed it with her. As a matter of fact, I told her more than likely if she would paint it up a little bit and paper it and fix up the woodwork—"

The evidence also showed that Powell had advised Mrs. Shannon on business matters before Virlea's death. Note the following in his testimony.

"Q. Now, Mr. Powell, did you ever discuss with Daisy Shannon and her daughter Virlea in regard to their bank account before she died? A. Mrs. Shannon wrote me and told me that Virlea was ill and she was going up there and while she was in Kansas City she kept me well informed as to her health and she told me she didn't think Virlea was going to make it, and I wrote and told her to get Virlea's money that she had at the Exchange National Bank made over in her name,—Mrs. Daisy Shannon's name,—so if Virlea got too sick and was unable to write a check that she would have the privilege of writing a check without going through a lot of red tape, and so forth, and that money in the bank was money of Virlea's that I asked Mrs. Shannon to have Virlea turn over to her.

"Q. That was made into a joint account? A. Yes, sir; joint account."

After Virlea's death and while Powell was administrator of her estate the probate court, upon his petition, made an order granting him the control and management of the real estate which was given him by the will. There was sufficient personalty in the estate to discharge all obligations against it. It further appeared from the evidence that when testatrix came to Jefferson City on March 24, she stayed at the home of the Powells and the next day Powell accompanied her to the office of attorney James. The defendants contended at the trial and offered evidence in support thereof that the principal business at the lawyer's office that day was the delivery to Mrs. Powell of some personal effects which had belonged to her daughter and for which she signed a receipt on that day. Defendants' evidence disclosed that immediately thereafter the question of the [846] execution of the will was taken up while Powell was at the office; that the will was read to Mrs. Shannon and she personally read it and stated it was the way she wanted it. A Mr. D. W. Gramling was called in from another office and he and Mrs. James signed the will as witnesses. The defendants' evidence further disclosed that Powell and Mrs. Shannon left the office together and deposited the will in a lock box at a local bank over which defendant had control and for which he had the key. Mrs. Shannon was in ill health at that time, grew steadily worse and died within less than a month. For some time prior

to the death of testatrix Mrs. Nancy Powell had been living in the state of Indiana where she was engaged in school work. She testified that she corresponded regularly with her husband, but that she never heard of the will until after the death of Mrs. Shannon.

We are of the opinion that the evidence was sufficient to justify a finding that a confidential relationship existed between Powell and Mrs. Shannon. In fact the existence of such a relationship could be inferred from the evidence of Powell. The order of the probate court appointing Powell as agent to take charge of the real estate of Mrs. Shannon which had been bequeathed to him merely confirmed the existence of an agency which had theretofore existed. Testatrix had for some time prior to the execution of the will reposed trust and confidence in Pat Powell. He had advised her in legal as well as business matters and had also been the principal business advisor of the daughter Virlea. In C. J. S., vol. 15, page 822, we read as follows:

"Apart from the origin of the confidence reposed or the source of the influence exerted, such a relation arises whenever a continuous trust is reposed by one person in the skill or integrity of another, and so it has been said that all the variety of relations in which dominion may be exercised by one person over another will fall within the general term 'confidential relations.'"

The confidential relationship existing between Powell and Mrs. Shannon and the fact that he was the administrator of the daughter's estate presented numerous opportunities for making suggestions to her about a will. The rule in this state, as outlined in Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772, is, that proof of a confidential relationship existing between a testator and one charged with undue influence who has been given a substantial bequest is not alone sufficient to authorize a submission of such an issue to a jury. In addition thereto the evidence must show that the party charged with undue influence was active in procuring the execution of the will. This fact may be proven by circumstantial evidence. Larkin v. Larkin, 119 S. W. (2d) 351, l. c. 358 (14-18); Webster v. Leiman, 328 Mo. 1232, 44 S. W. (2d) 40, l. c. 41 (2).

In this case we deem the evidence ample to sustain a finding that Powell was active in having Mrs. Shannon execute the will in question. Powell's evidence disclosed that Mrs. Shannon placed implicit confidence in him and that she sought and obtained his advice in practically all her business matters. She requested him to act as administrator of her daughter's estate. The attorney acting for Powell accompanied him on the journey to Brunswick when testatrix is alleged to have given the attorney directions as to the writing of the will. Then Powell accompanied Mrs. Shannon to the attorney's office, was present when the will was executed and thereafter took charge of the will and placed it in a lock box over which he had control and for which he had the key. The testatrix took a copy. In such cir-

cumstances it is unbelievable that Mrs. Shannon did not consult Powell and obtain his advice with reference to the will. Add to that the fact that he was bequeathed the major portion of the property and the circumstances proven are sufficient for a jury to find that Powell·was in fact active in the procurement of the will. The evidence was ample to submit the issue to a jury. Gott v. Dennis, 296 Mo. 66, 246 S. W. 218, 1. c. 224 (6) (7); Odom v. Langston, 347 Mo. 1201, 152 S. W. (2d) 124; 68 C. J. 1098, sec. 919.

Appellants urge that the testatrix had good reason for not giving her property to her sister and brother. There was evidence that due to a difficulty between testatrix and her sister many years before, the feeling between them was strained; that this trouble arose over testatrix' daughter and therefore she did not want the sister to receive any of the property which had belonged to the daughter. However, there was substantial evidence to the contrary. Letters introduced in evidence, written by testatrix to both the sister and brother, gave no evidence of any bad feeling, but on the contrary were couched in endearing [847] terms. It was conceded that for many years the brother had given testatrix small sums of money on various occasions. It was not necessary for testatrix to have a good reason for giving her property to her friends in place of her relatives. It was her property to do with as she wished. The issue for the jury was whether Powell in view of his confidential relationship took advantage of that situation and exerted influence over testatrix in the making of the will. There was evidence that testatrix made statements to the effect that her sister and brother had not visited her for many years and she was not going to leave them any property. On the other hand there was evidence of statements alleged to have been made by testatrix that her brother and sister were the only relatives she had and that she desired all of her property to go to them. There was also evidence that she was easily influenced. One of the proponents' witnesses so testified. He had been testatrix' physician for a number of years. It would serve no useful purpose to review in detail all of this evidence because the jury passed upon the question and we cannot disturb the verdict unless we find error in the record.

Appellants urge in their brief that the trial court erred in admitting certain evidence offered by contestants. We have examined the record with reference to each assignment made. We find a number of them were not preserved for review because no objction to the introduction of the evidence was made at the trial, and in several instances an objection came after the witness had answered the question. These will not be further noticed. Objection was made to evidence showing the amount of money in the hands of Pat Powell as administrator of Virlea's estate prior to the death of Daisy Shannon. It was with reference to this estate that Powell was negotiating when he went to Brunswick to see Mrs. Shannon. The defendants offered evidence that there was sufficient personal property in the estate to

pay all the debts and therefore some of this property was delivered to Mrs. Shannon prior to any settlement in the probate court. It was this estate or the property in the estate that Mrs. Shannon was to receive as heir of her daughter and which was bequeathed to Powell in the will in question. The evidence was therefore admissible to show the amount of property bequeathed to Powell by the will. Appellants introduced similar evidence and they are in no position to complain.

██ ██ ██ It is urged in the brief that evidence with reference to consultations Powell had had with attorney James on other matters was immaterial. The evidence only went so far as to show that Powell had consulted James with reference to other matters. This was competent because James wrote the will and his relationship to Powell was a circumstance for consideration of the jury. Evidence was introduced of statements alleged to have been made by testatrix that she intended to give her brother and sister all the property she had. In the brief the point is made that the evidence should have been confined to the time of the execution of the will. It was disclosed that the statements were alleged to have been made after the visit of Powell and his attorney to Brunswick and before the will was executed. The contention then as to the time the statements were made was without merit as the will was then under consideration. Appellants complain because the trial court permitted Tom Smith, a witness for appellants, to be cross-examined with reference to letters alleged to have been written by the testatrix to her brother and sister. From the record it appears that this witness may be justly termed a "know-all" witness. He seemed to know all about the business affairs of testatrix, for he stated that she read her personal letters to him and consulted him about business matters; that he tried to persuade her to leave her property to the sister and brother but she refused. In view of that evidence it was not error to subject the witness to a severe cross-examination. He was impeached as to his reputation for truth. We may also comment that appellants are in no position to vouch for this witness' credibility. His evidence was in direct conflict with that of Mr. and Mrs. James and Powell on vital matters concerning the execution of the will in question.

Evidence of statements alleged to have been made by testatrix that she intended to leave her property to her brother and sister was also competent to refute the evidence tending to show that testatrix was not on friendly terms with them. The statements were alleged to have been made at the very time the will was under consideration and only a few weeks before it was executed. See 79 A. L. R., page 1449. The letters containing terms of endearment [848] were introduced. However, Tom Smith claimed credit for having induced the testatrix to insert the endearing terms. The question of the admissibility of such evidence was ruled adversely to appellants' contention in Gott v. Dennis, supra, 246 S. W. 218, l. c. 223 (2) 224, 225 (8).

Next appellants complain because the trial court did not permit the probate judge of Cole county to testify with reference to a claim testatrix filed against her daughter's estate for sums paid by her during the daughter's illness. The record disclosed that the claim itself was admitted showing the account in detail. The evidence of the probate judge could not have added to that. Again, appellants urge that Powell should have been permitted to testify that he advised F. C. Heariold and his wife, Virlea, to take title to the real estate in question as a joint estate so that the survivor would take title. It was admitted in the record that the title was so vested and that upon the death of Heariold his wife, testatrix' daughter, became the absolute owner of the property. The evidence was offered on the theory of showing that the property devised to the Powells came from Heariold and not from the Shannon family. That was conceded by the evidence.

The correctness of instructions (A) and (B), given on behalf of contestants, was preserved for review. In substance instruction (A) informed the jury that if they found and believed from the evidence that a confidential relationship had existed between testatrix and Pat R. Powell, that testatrix reposed faith and confidence in the said Powell, that Powell was given the greater part of the estate by the purported will, that Powell had opportunity to exercise undue influence and thereby cause the execution of the will and that he was active in procuring the will in question, then the jury was authorized to find that the will was the result of undue influence. As we view the situation the instruction required the jury to find all the elements necessary to set aside the will in question. It must be remembered that Powell was a stranger in blood to the testatrix. In Loehr v. Starke, supra, this question was reviewed at length by the court en banc. It was ruled that the mere showing of a confidential relationship between a testator and a beneficiary of a will is not sufficient to set aside the will, but if in addition thereto the evidence discloses that the beneficiary who stood in the confidential relationship was active in procuring its execution then a verdict setting aside the will is justified. Appellant argues that the instruction was broader than the pleadings and also that it minimized and destroyed the effect of the defendants' evidence. These criticisms are without merit. The petition charged that a confidential relationship existed and the instruction substantially followed the charge made. The answer specifically denied the existence of a confidential relationship and the defendants requested and the court gave instructions upon that issue. The instructions submitted to the jury the question of the ultimate fact of whether a confidential relationship existed. The instruction in no way minimized the defendants' evidence. Moll v. Pollack, 319 Mo. 744, 8 S. W. (2d) 38, l. c. 46 (9) (10). Instruction (B) defined undue influence. It is alleged to be erroneous because written in the disjunctive it authorized a verdict for plaintiff if the jury found from

the evidence that the actions of the defendant Powell confused the mind of Daisy Shannon "in the execution of the paper writing read in evidence as and for her last will and testament, so that said instrument does not express the will, wish, or desire of the said testatrix in the disposition of her property, then and in that event your verdict should be for the plaintiffs."

It is urged that a finding that the testatrix' mind was confused was not sufficient. It must be noticed, however, that the instruction required the jury to find that the mind became confused to such an extent that the purported will, as executed, did not express the wish and desire of the testatrix. If it did not, then of course it was not her will. The word "confuse" as used in the instruction, was therefore sufficient when considered in connection with the balance of the instruction. As to the meaning of the word "confuse" see Webster's New International Dictionary, 2nd Edition. The defendants offered and the court gave a number of instructions upon this question. Note one of these as follows:

"The Court instructs the jury that 'undue influence' as used in these instructions means such influence as amounts to overpersuasion, coercion or force, overpowering and destroying the free agency and will power of the person upon whom it is used, and that no amount of influence or advice [849] or persuasion which comes short of such effect will amount to undue influence; and that the mere influence of affection or attachment, or the desire to gratify the wishes of one beloved, respected and trusted by the testatrix, does not constitute undue influence within the meaning of the law.

"The Court further instructs the jury that it is not sufficient to warrant finding against the will merely because there may have been an opportunity for the defendants, or either of them, to exercise an undue influence over the mind of the testatrix, but that before you are warranted in finding against the will of Daisy Shannon on the ground of undue influence, the plaintiffs must prove to the reasonable satisfaction of the jury that undue influence, as defined above, was actually exercised and exerted over the mind of the testatrix by the defendants, or either of them, at or prior to the execution of the will; that such undue influence was actually operative on the mind of the said Daisy Shannon at the time of the execution of the will, and that by reason thereof the testatrix was unable to make her will in accordance with her own judgment."

When these instructions are read together the question as to the degree of undue influence necessary to set aside a will was submitted to the jury in as favorable a manner as the defendants were entitled to under the law. Kaechelen v. Barringer, 19 S. W. (2d) 1033, l. c. 1039. Appellant also complained because the trial court refused to give instructions numbers four and six. Instruction four was erroneous because it stated the law to be that undue influence to invalidate a will must be exerted at the time of the execution of the will. See

Kaechelen v. Barringer, supra, 19 S. W. (2d) 1033, l. c. 1039 (15). Instruction number six we find to be a repetition of what was contained in instructions numbers thirteen and fifteen given at defendants' request.

■ It is urged in the brief that the verdict was the result of passion and prejudice induced by prejudicial statements and remarks made by counsel for contestants throughout the trial. We have examined the pages of the record referred to where these remarks are found and find that the attorneys on both sides of the lawsuit interposed remarks, often of a personal nature, which were improper. On such occasions the trial court admonished the lawyers not to argue among themselves. The matters are not of such a nature as to require a detailed discussion thereof and since both parties indulged therein we let the matter rest.

Finding no reversible error in the record the judgment is affirmed.

PER CURIAM:—The foregoing opinion by WESTHUES, C., in Division Two, is adopted as the opinion of the Court en Banc. *Hyde, Tipton, Clark, JJ.*, and *Douglas, C. J.*, concur; *Ellison, J.*, dissents in separate opinion; *Leedy, J.*, dissents and concurs in dissenting opinion of *Ellison, J.*; *Gantt, J.*, absent.

■ ELLISON, J. (dissenting).—I respectfully dissent from the part of the principal opinion upholding plaintiff-respondents' instruction B which is as follows (italics hereafter throughout are mine):

"The Court instructs the jury that undue influence, such as is meant in these instructions, is an influence that restrains, controls, directs and diverts or coerces the will, *or overcomes and confuses* the mind and judgment; and if they believe from the evidence that the defendants, Pat Russell Powell and Nancy Powell, or either of them, or any other person or persons in their behalf, by persuasion, importunity or other device or machination, controlled, directed, restrained and coerced the will *or confused* the mind of the testatrix, Daisy Shannon, deceased, *or confused* and overcame her power of judging upon the true relations between herself and those who were the natural objects of her bounty, in the execution of the paper writing read in evidence as and for her last will and testament, *so that* said instrument does not express the will, wish, or desire of the said testatrix in the disposition of her property, then and in that event your verdict should be for the plaintiffs."

Appellants' brief assails the instruction saying it is bad because it permits the jury to find against the will if the testatrix became confused; and then asserts: "This is not the law in this state and never was." [850] The only authority cited by appellants is Fowlkes v. Stephens, 342 Mo. 247, 251, 114 S. W. (2d) 997, 998. That case was concerned solely with an instruction on testamentary capacity. The only application it can have here, it seems to me, is its holding that

instructions minimizing the effect of evidence are prejudicial. They are also prejudicial if they minimize the effect of the law. I think instruction B has that vice. Respondents' brief cites no authority in support of it and makes no defense of it except to say "when read in its entirety the instruction is not subject to that criticism." However, there is one precedent for the instruction. It was approved in Moore v. McNulty, 164 Mo. 111, 112(4), 64 S. W. 159, 162. The instruction is credited to that one case and set out in 4 Raymond Mo. Instrs. (Perm. Ed.), sec. 10246, p. 219, and 5 Randall's Instrs. to Juries, sec. 5299(4), p. 5483. I have not found any subsequent case in which it was used and approved until now.

My understanding of the law is that influence to be undue must amount to *coercion* producing the will as it was made. Thus it is said in 68 C. J., sec. 917, p. 1093: "To justify submission of the issue of undue influence to the jury, there must be evidence of probative force from which the jury could find that the will of the testator did not speak his real mind but spoke that of the person dominating him so that he was under an influence amounting to coercion . . ." So also 28 R. C. L., sec. 91, p. 137 says: "It must be such as to control the mental operations of the testator, overcome his power of resistance, and oblige him to adopt the will of another, thus producing a disposition of property which the testator would not have made if left freely to act according to his own pleasure. The means of control are not important, and may consist of force or coercion, violence or threatened influence, or moral coercion."

Looking to our own decisions, in the same Moore case from which the above instruction was taken, the court gave for the proponents (164 Mo. l. c. 123, 64 S. W. l. c. 162) another instruction No. 4 which declared: "The influence exerted upon a testator which would be sufficient to invalidate his will must be such as to amount to over-persuasion, coercion or force, destroying his free agency or will power, and not merely the influence of attachment or a desire to gratify the wishes of a friend or neighbor." Still another instruction, approved in Munday v. Knox, 321 Mo. 168, 183(X), 9 S. W. (2d) 960, 965(10) declared: "The term 'undue influence' as used in these instructions, does not mean that influence which arises from affection or a desire to gratify the wishes of one beloved; but means an influence exercised upon the mind of the testator at the time he makes his will in such a way as to amount to over-persuasion, coercion or force sufficient to destroy the will power of the testator and deprive him of his free agency to dispose of his property according to his own inclinations."

Further on the negative side of the question two other decisions may be cited. The following instruction was approved in Seibert v. Hatcher, 205 Mo. 83, 97(4), 102 S. W. 962, 965(4): "The jury are instructed that the words 'undue influence,' as used in these instructions, mean such influence as amounts to overpersuasion, coercion, or force, overpowering and destroying the free agency and will power

of the person upon whom it is used, and *no amount* of influence or advice or persuasion which comes short of such effect will amount to undue influence. The mere influence of affection or attachment or the desire of gratifying the wishes of one beloved, respected, and trusted by the testator does not constitute undue influence within the meaning of the law." And an instruction in Gordon v. Burris, 153 Mo. 223, 240, 54 S. W. 546, 551(10) declared: "The court instructs the jury that the words 'undue influence,' as used in these instructions, do not mean mere coaxing or persuasion, which may cause the person coaxed to alter or change the mind so as to act differently from what they would if there had been no coaxing, but do mean an influence exercised by one person over the mind of another, which destroys the free will of the latter, and renders it incapable of carrying out its own purposes and desires, and *compels and forces* it to adopt and accept the will and purposes of the person exercising such power as his own, which he would not have done if he had not been constrained by such influence. . . ."

The matter was summed up in Turner v. Anderson, 236 Mo. 523, 541, 139 S. W. 180, 184(1) in this manner. "The proof of influence alone is not sufficient. It must be undue. . . . Undue influence to be effective in breaking a will should be of sufficient potency to destroy the free agency [851] of testator at the time of making the will. . . . The undue influence that will break a will must be present, in active exercise and rise to the mark of such overpersuasion, coercion, force, fraud or deception, as breaks the will power of testator and puts in its stead the will of another."

Now without multiplying quotations from these familiar decisions, it seems clear that there is a plain distinction between *confusion* and *subservience* in the mind of the testator. True, the next to the last clause of the instruction does require that the confusion must be such, or "so that," the will as made does not express his wish or desire. But that could be true without external coercion. A testator might be torn by indecision as to the relative merit of the claims upon his bounty of his loved ones or friends; and, without any duress whatever except that of his own conscience and sense of justice, he might make a will which did not speak any clear desire or conclusion on that question. But that would not justify setting the will aside when he had not seen fit to revoke it.

There were good reasons why the testatrix in this case might have wanted to leave the appellants Powell the property the will did give them. The testatrix was a negro woman 59 years old, a widow without lineal descendants. She lived in Brunswick, Chariton County, and had a sister, Ida Clark, who lived in Denver, Colorado, and a brother, Angus Turpin, who lived in Chicago, Illinois. The testatrix had not seen the sister for 30 or 40 years and the brother for 20 years, though there was testimony of correspondence between them, and evidence pro and con as to the state of her feeling toward them. There was

also evidence that the appellant Pat Powell had put himself in a position to serve the testatrix in a business and personal way shortly before her will was written. No effort will be made here to review the evidence in full. The point in the writer's mind in making the statement at the beginning of this paragraph was the way in which the testatrix' will divided her property.

She had a house and lot in Brunswick and some household goods and personal effects of her own, of the appraised value of $741, all of which she left to the respondent brother and sister. As sole heir of her deceased daughter she had inherited another residence property in Jefferson City and some personal property and money of the value of $7500 to $10,000, which she left to the appellant Powells as her residuary estate. The daughter Virlea Heariold, had predeceased the testatrix about two months and the former's estate was then in process of administration in Jefferson City. It was through that channel that the testatrix acquired the Jefferson City property. And that property in turn had come to the daughter Virlea from her husband, Frank Heariold, who had died about three years before. Heariold had been on the faculty of Lincoln University. The appellant Pat Powell also was on the faculty. The appellant Nancy Powell is his wife. The Heariolds and Powells were next door neighbors and close friends. When Frank Heariold bought his home, on Powell's advice the title was taken by the entirety. Heariold also had a $5000 life insurance policy, the proceeds of which eventually went to the instant testatrix. When Frank Heariold was in his last illness Pat Powell gave him blood transfusions; and he made the funeral arrangements and was administrator of his estate. Virlea moved over with her mother in Brunswick. Pat Powell managed her Jefferson City property; and when she died three years later the Powells were attentive at her funeral there. Daisy Shannon, the mother, signed a waiver of right to administer on the daughter's estate in favor of Powell, who was appointed. He conferred with the testatrix several times during the two months following until she died, and her will was written in between. Granting this and other evidence may tend to show a fiduciary relation and undue influence, or at least an opportunity to exert it; yet it may also show *why* Daisy Shannon may have thought in deference to her deceased daughter and son-in-law her obligation to their friends and helpers, the Powells, was heavier. Respondents' brief concedes she considered them ''good friends.'' None of this is said by way of commenting on the weight of the evidence; but only to show why an instruction would be harmful, which told the jury if such ministrations *confused* the mind of the testatrix and caused her to make a will that did not express her wish and desire, it would be undue influence.

It would have been very easy to have confined the instruction to a legitimate range in describing the extent and effect of the influence. But professional zeal not **[852]** infrequently goads the legal practi-

tioner to strain the limits set by the law (in this case with a precedent sanctioning it though not cited). Only recently in humanitarian negligence cases we have condemned on that ground instructions fastening liability on a plaintiff if the defendant was *approaching* a position of imminent peril (when the law requires him to be *in* peril). Buehler v. Festus Mercantile Co., 343 Mo. 139, 158(8), 119 S. W. (2d) 961, 970(12). And in State ex rel. Snider v. Shain, 345 Mo. 950, 954(3), 137 S. W. (2d) 527, 529(3), where the instruction imposed liability on the defendant if the plaintiff was "immediately coming into a position of peril" this court held it erroneous, saying that would put the plaintiff "almost, but not quite" in such a position. Reverting to the case in hand, it has been said "Courts are fond of sustaining wills"; and that "as neither courts nor juries can make wills for men they ought to be careful in unmaking them." Turner v. Anderson, 260 Mo. 1, 17, 29, 168 S. W. 943, 947(2), 951. The making of a will is one of the most important transactions in a lifetime, yet the maker cannot remain here to see that it is enforced, but must leave that to the courts and the law. Certainly the instructions to a jury in such a case ought to be free from misguidance. *Leedy, J.,* concurs.