Michael Blaine WILHOIT, a Minor, by his
Guardian, Roy Wilhoit, Respondent,

v.

Marjorie Baker FITE, an Individual, and
Marjorie Baker Fite, Executrix of the Es-
tate of *Julia Wilhoit*, deceased, Appellant.

No. 47778.

Supreme Court of Missouri,

Division No. 1.

Dec. 12, 1960.

Motion for Rehearing or to Transfer to
Court en Banc Denied Jan. 9, 1961.

Wear and Wear, Sam M. Wear, William A. Wear, Springfield, for defendant-appellant.

Walker, Daniel, Clampett, Rittershouse & Ellis, W. Ray Daniel, Ransom A. Ellis, Jr., Neale, Newman, Bradshaw, Freeman & Neale, Jean Paul Bradshaw, Springfield, for plaintiff-respondent.

HOLMAN, Commissioner.

Action to contest the will of Julia Wilhoit, deceased. The alleged will was executed on June 6, 1952, testatrix died December 27, 1956, and the will was admitted to probate by the Probate Court of Greene County on December 31, 1956. The estate consisted of personal property having an appraised value of $53,101. Plaintiff is the grandson and sole heir of testatrix. He is a minor and therefore is prosecuting this action by his guardian. The will bequeathed one dollar to plaintiff. The remainder of the estate was bequeathed to defendant Marjorie Baker Fite, Mrs. Wilhoit's former daughter-in-law. The trial resulted in

a verdict to the effect that the "paper writing" was "not the will of Julia Wilhoit, deceased." Defendant, individually and as executrix, has duly appealed from the judgment entered upon the verdict.

The case was submitted to the jury upon the sole issue as to whether the instrument was procured by the undue influence of the principal legatee, Mrs. Fite. Upon this appeal defendant contends that plaintiff failed to make a submissible case, the court erred in giving plaintiff's Instruction No. 7, and also erred in the admission and exclusion of certain evidence.

After making provision for the payment of debts the alleged will provided as follows:

"II. I give and bequeath to my grandson, Michael Blaine Wilhoit, the son of my departed son Thomas E. Wilhoit, the sum of One Dollar. My reason for this bequest of only One Dollar, is that I have full faith and confidence in my daughter-in-law Marjorie Baker Wilhoit, the widow of my departed son, knowing full well that she will contribute to my said grandson, sufficient amounts to properly care for him.

"III. All of the rest and residue of my property of whatever nature or kind, real, personal or mixed, I give, devise and bequeath to my daughter-in-law Marjorie Baker Wilhoit, to have as her absolute property.

"IV. In the event that my daughter-in-law Marjorie Baker Wilhoit should pre-decease me, or in the event of our simultaneous demise, then, and in that event, I give, devise and bequeath all of the rest and residue of my property of whatever nature or kind, real, personal or mixed, to Sam M. Wear, in trust however, for my grandson Michael Blaine Wilhoit, and it is my will that said trustee shall have full power to manage and control said property and to transfer, sell and convey any part of it going to him under

this, my Last Will, as he thinks it necessary, with full power to invest and reinvest the same, together with any of the income therefrom.

"V. I give to my trustee full power and discretion to pay to my said grandson, such amount or amounts from the income of said trust estate, periodically as shall, in said trustee's sound discretion, be needed by my said grandson to properly maintain, support and educate him. It is further my will that no amount of the corpus of said trust estate shall be paid to my said grandson until he reaches thirty years of age, at which time I direct my trustee to pay, convey and turn over to my said grandson, the entire trust estate including any accumulated income therefrom, to have and to hold as his absolute property.

"VI. If for any reason Sam M. Wear is unable or not willing to serve as such trustee, then it is my will that William A. Wear serve as such.

"VII. I hereby nominate my daughter-in-law Marjorie Baker Wilhoit, executrix of this, my last will and testament and it is my will that she be permitted to serve without bond. In the event that she should pre-decease me, or in the event of our simultaneous demise, then I nominate Sam M. Wear, executor of this, my last will and testament, and in the event that he is unable, or not willing for any reason to serve as such, then I hereby nominate William A. Wear, executor of this, my last will and testament."

Julia Wilhoit and her husband had been very successful in the theatre business. Mr. Wilhoit died in 1936 and left (to Julia) an estate of approximately $250,000. They had one child, Tom, who married plaintiff's mother, Charlene, in February 1938. Admittedly, Tom drank intoxicating liquors to excess and for that reason Charlene obtained a divorce from him in September 1941 when plaintiff was less than a year

old. The divorce decree apparently provided that Tom pay Charlene $40 per month for the support of plaintiff. That was paid by testatrix until Charlene began receiving monthly social security payments following Tom's death.

A few months after the divorce Tom was married to Marjorie Baker, defendant herein. They lived together until Tom's death in the latter part of May 1952. Tom had suffered from "cirrhosis of the liver" and was practically an invalid for a year or more prior to his death. His estate was appraised at $85,000. His will left all of his estate to defendant except a bequest of $1.00 to plaintiff, his son. Apparently all of the Wilhoit real estate had been deeded so that Tom and his mother (testatrix) each owned one half thereof as tenants in common. Tom's interest therein was appraised at almost $39,000 but there was other evidence that it had a value of $59,000 at that time. Another asset in Tom's estate was a one-half interest in a secured note for $75,000 which he and testatrix received upon the sale of the Princess Theatre Building. More will appear later concerning the aforementioned note and real estate.

There are certain facts about which there is no controversy. They are (1) that testatrix loved plaintiff very much and desired to make provision for his education, and also desired that he (or contingently his children) receive the bulk of her estate at an appropriate time, and (2) testatrix and Marjorie were very congenial and testatrix had "great faith and confidence" in her.

The will was prepared by William A. Wear, a Springfield attorney. He had known testatrix all of his life and represented Marjorie in the administration of Tom's estate and was one of the attorneys for her in the case at bar. Mr. Wear testified that a few days after Tom's death Mrs. Wilhoit and Marjorie came to his office together and each of them gave him instructions concerning the preparation of her will; that Marjorie and testatrix were both in his private office throughout the conference; that as a result of the directions he received at that time he, within a day or so thereafter, prepared the will of Mrs. Wilhoit which is involved herein; that at the time Marjorie and Mrs. Wilhoit were in the office Marjorie instructed him to prepare a will for her leaving her property to Mrs. Wilhoit and that he had prepared such a will.

The will involved in this case was executed on June 6, 1952, at the home of Mrs. Wilhoit. Marjorie was not present at that time. Mr. Wear and his secretary, Stella Dando, signed the will as witnesses. After the will was executed Mr. Wear, at the request of testatrix, retained possession of it and placed it in his office safe. There was evidence that prior to its execution Mrs. Wilhoit read the will, and that Mr. Wear had explained each item to her in detail. He testified that he explained to testarix that Marjorie, under the terms of the will, would not be legally obligated to give anything to the plaintiff, "but she told me that she had discussed the whole thing with Marjorie, and that Marjorie was going to see that the boy was educated; she was going to, when the boy was mature enough, to turn over most of the property to the boy. And I explained to her that there was nothing in the world in the will that would cause that to happen, but she said that is the way she wanted it, and gave me her reasons for it. Q. What reasons did she give you? A. One reason was, the fact that she and her husband had spoiled Tom so, that everything he wanted he got; that he didn't finish his education, and she wanted the grandson to finish his education, and she didn't want the grandson to have the slightest idea what he might eventually come into in the way of money and property. She also wanted it flexible, and she wanted it left to Marjorie's discretion, and wanted it left to Marjorie because she had discussed it with Marjorie, and Marjorie knew the situation."

Mr. Wear stated that he advised testatrix against leaving her property in that manner and explained to her that she could

leave the property in trust for the plaintiff and accomplish the same result "except for the flexibility of it," but that testatrix stated that she "wanted it exactly the way it was, because Marjorie knew the way she wanted it handled, and she knew Marjorie would do it exactly the way she wanted it done."

Mr. Wear also testified that on July 9, 1952, Mrs. Wilhoit and Marjorie came to his office and each of them signed a deed or deeds (which he had prepared at their request) conveying all of the Wilhoit real estate (in which each owned an undivided one-half interest) to his secretary, and that in accordance with the wishes of Marjorie and Mrs. Wilhoit, the secretary deeded the property back to them as joint tenants with right of survivorship. He stated that Mrs. Wilhoit had expressed the desire to so convey the property in order to save probate expense and inheritance taxes.

Mrs. Lena Wilhoit, a sister-in-law of testatrix, testified that during the year prior to Tom's death she visited often with testatrix; that about a year before Tom's death testatrix suffered a stroke and in the months before Tom died "Julia wasn't well, and when Tom died it upset her so, she was very confused at the time, and she wasn't a bit well"; that after Mrs. Wilhoit had suffered the stroke "she told me she was— would get bothered, and muddled."

Elizabeth Morris, a niece of testatrix by marriage, testified that she had lived near Mrs. Wilhoit for five or six years before the will was made; that shortly after Tom's death testatrix told her that she had made her will and had taken care of Mike—had set up a trust fund for him; that she had often told her that she was going to see that Mike had an education. This witness also testified that she had seen defendant come over to Mrs. Wilhoit's home and would get the "rent money" and take it to the bank; that she had seen defendant bring checks over for testatrix to endorse so that she could deposit them; that "she was doing banking for Mrs. Wilhoit at that time"; that Mrs. Wilhoit had said that Marjorie had relieved her of mak-ing out her income tax returns. This last statement was objected to and admitted solely to show the state of mind of testatrix.

Roy Wilhoit, a brother of the deceased husband of testatrix, testified that during Tom's illness Mrs. Wilhoit and defendant managed the business properties; that testatrix "had a rather bad spell" six or seven months before Tom's death; that when Tom died "she seemed to go all to pieces; * * * you could talk to her, and she seemed—well, her mind seemed to drift, wouldn't keep on a subject. And she said she was so forgetful about things that she didn't know whether she told you about some incident that happened or not. It seemed to affect her mind"; that shortly before Tom's death testatrix had said that Marjorie had suggested that she ought to make another will and in that connection testatrix had said that "she wanted to provide for her grandson. She had spoken of that several times before, that she wanted to see that he got a good education, and see that he was taken care of, but she didn't want him to have any of the money until he was thirty years old, and that she didn't know hardly just what to do, and said that Marjorie had said, 'if you make— put it up in a trust until he is thirty years old, the lawyers and the probate court would have most of it,' and she didn't know just what to do."

The witness further testified that he visited Mrs. Wilhoit the evening or the next day after she had signed the will and she stated (referring to plaintiff) that she had provided in the will "for his education, and he would get the bulk, all of her estate, when he would reach thirty years old"; that on one occasion testatrix had told him in a discussion of the division of the Wilhoit properties that "Marjorie had got Tom's property, Tom's portion, and didn't leave Michael anything, so she was going to leave all of her estate to Michael." Mr. Wilhoit also testified that Marjorie had been very attentive to testatrix from the year 1951 until her death; that Mrs. Wilhoit never seemed to have any bitterness

towards Charlene, Tom's first wife. He also stated that Mrs. Wilhoit was a person who "never questioned you if she had confidence in you but if she didn't, wasn't acquainted with you very well, she wouldn't have much to do with you." This witness also stated that Marjorie looked after Mrs. Wilhoit's business "pretty much" and attended to the banking business, kept track of the accounts, and saw that the bills were paid.

Plaintiff's mother, now Charlene Zimmerman, testified that plaintiff was 18 years of age at the time of trial; that the agreement had always been that testatrix would provide for plaintiff's college education and on two occasions before Tom's death Mrs. Wilhoit told her that she intended that "Michael have what she had"; that defendant had never sent Michael anything except birthday or Christmas gifts, and had not advised her before the suit was filed that she had agreed with testatrix to hold the estate for Michael.

Plaintiff testified that he attended his father's funeral and that in a conversation with his grandmother at that time she told him that Marjorie had had some papers prepared and that she would have to go down town with her and sign them; that his grandmother had often told him that someday he would be a rich young man and that it was important that he get a good education so that he could take care of "the money and property that someday I would have."

Defendant testified that throughout her married life with Tom they had collected the rent from the Robberson Street property and Mrs. Wilhoit had handled the other rental income; that they had had a rather unusual arrangement in that the money went into a common fund controlled by Mrs. Wilhoit but that everybody used whatever money was needed; that a month or two before Tom's death she and Mrs. Wilhoit had discussed what they would do financially after Tom was gone and at Mrs. Wilhoit's suggestion they agreed to go on "just as we always have." She stated

that testatrix kept all the books on the rental properties "except Robberson" and, in regard to the tax returns, stated, "I helped to assemble the tax figures. Of course, I did Tom's and my taxes, and I usually would go over hers with her, from a tax standpoint, to see that she got everything that was deductible included before she took her books up to Mr. Chinn." She testified at length concerning directions given her by testatrix concerning the disposition of the money bequeathed to her in the will. She stated that two of Mrs. Wilhoit's sisters were to have $1,500 each and another $1,000; that she was to "take care of Michael's education" and that "she [testatrix] wanted him to stand on his own two feet and make his own way, achieve a degree of self-sufficiency, and know the value of money, before he was to receive the balance of * * * the estate." In regard to the time Michael was to receive the bulk of the estate, "she said it would have to be entirely up to my judgment. She said she had always felt that probably by the time he is thirty he would be sufficiently mature to handle it. However, she said she didn't want anything cut and dried about it; she wanted to keep the thing as fluid and flexible as she could, so that I could determine, in my own judgment, when he had reached the point when he was able to take care of it," and in regard to the possibility of Michael getting married and having children, "she wanted something set aside in a trust, to be earmarked for what children he might have, to insure their education."

Mrs. Fite also testified that before Tom's death she had promised him that she would never let Michael "do without an education" and would see that he was taken care of; that there was $50,000 still due on the note secured by a deed of trust on the Princess Theatre and that note had been made jointly to testatrix and herself so that she now owned all of that note.

In regard to her personal right to Mrs. Wilhoit's estate, Marjorie stated that Mrs. Wilhoit did not intend that she should get "this property that went under the will; I

was merely to be the guardian, to have the stewardship of the money. * * * I feel that I have no moral claim to it whatsoever. It is merely a legal thing * * * and it is from those funds that I expect to take care of both Michael and the others. * * As soon as this lawsuit is settled I fully intend to set up a trust for the boy. * * * I would have set it up long since, had this suit not been filed." The witness admitted that since Tom's death she had not contributed anything to Michael's education or support.

Plaintiff proved as an admission against interest against defendant that in a deposition defendant had stated that she and Mrs. Wilhoit had "a joint lock box at the Union National Bank."

Testatrix was approximately 70 years of age at the time the instant will was executed. A number of witnesses testified that she was of sound mind at the time the will was made and was a strong-willed person.

Leonard Chinn, a tax attorney, testified that he made Mrs. Wilhoit's income tax returns and that she kept the records relating to the Wilhoit properties; that she "wrote a clear hand and maintained an accurate set of records." Nora Rogers who worked as a maid for Mrs. Wilhoit (and now works for the defendant) related that a week or two after Tom's death testatrix told her that she had made a will and "was so happy because she got her will made like she wanted it"; that she wanted Michael to have a good education and wanted to leave him money when he was 30 years old, and that Marjorie would see that he got the money for his education.

■ Defendant's first contention is that the evidence was insufficient to make a submissible case upon the issue of undue influence. "By 'undue influence' is meant such influence as amounts to force, coercion, or overpersuasion, which destroys the free agency and will power of the testator." Sehr v. Lindemann, 153 Mo. 276, 54 S.W. 537, 540. "Undue influence need not be proven by direct and positive testimony; it may be inferred from all the facts and circumstances detailed in evidence * *. As a rule undue influence is not proclaimed from the housetop, but is hidden like a candle beneath a bushel and concealed like fraud and deception, only appearing through carelessness and unguarded openings. * * *." Coldwell v. Coldwell, Mo. Sup., 228 S.W. 95, 102. Closely related to the issue of undue influence is the question as to whether a confidential relationship existed between the testatrix and beneficiary. And it is important and relevant in determining questions concerning the existence of a confidential relationship and the exercise of undue influence to consider the physical and mental condition of testatrix during the period in question. Snell v. Seek, 363 Mo. 225, 250 S.W.2d 336.

■ In determining whether the evidence was sufficient to make a submissible case on the issue of undue influence we must accept plaintiff's "evidence as true, disregard proponent's evidence unless it aids contestant's case and give contestant the benefit of every favorable inference that may be legitimately drawn from the whole evidence." Glover v. Bruce, Mo.Sup., 265 S.W.2d 346, 352.

■ We have concluded that there is sufficient evidence in this case from which the jury could reasonably have found that at the time the will was executed a confidential relationship existed between testatrix and defendant. "The terms confidential and fiduciary are in general application synonymous. 'A confidential relation exists between two persons, whether their relations be such as are technically fiduciary or merely informal, whenever one trusts in and relies on the other. The question in such case is always whether or not trust is reposed.' Selle v. Wrigley, 233 Mo. App. 43, 116 S.W.2d 217, loc. cit. 221. In order for such relation to exist 'there must be evidence of a special trust with respect to the property or business.'" Hedrick v. Hedrick, 350 Mo. 716, 168 S.W.2d 69, 74.

Particularly supporting our conclusion is the evidence that (1) testatrix had great faith and confidence in defendant, (2) they each, to a certain extent, used money kept in a common fund, (3) they had a joint safety deposit box, (4) defendant collected certain rentals and made bank deposits for testatrix, (5) defendant assisted testatrix in checking her books and accounts in order to assemble her income tax figures, and (6) defendant looked after testatrix' business "pretty much."

■ However, "proof of a confidential relationship existing between a testator and one charged with undue influence who has been given a substantial bequest is not alone sufficient to authorize a submission of such an issue to a jury. In addition thereto, the evidence must show that the party charged with undue influence was active in procuring the execution of the will." Clark v. Powell, 351 Mo. 1121, 175 S.W.2d 842, 846. We are of the opinion that there were facts and circumstances in evidence (in addition to proof of a confidential relationship) which would reasonably have warranted the jury in finding that defendant was active in procuring the execution of the will in question. Various items of evidence support that conclusion. It should first be noted that testatrix had suffered a stroke about a year before the will was executed and would get "bothered" and "muddled." When Tom died she "went all to pieces," was forgetful, and her mind would drift. This condition made her more susceptible to influence than she would otherwise have been. We are also particularly impressed with the fact that defendant suggested to testatrix that she should make another will and told testatrix that if she put her estate in trust for plaintiff until he was 30 years old the lawyers and probate court would have most of it. That false statement evidently disturbed testatrix because at the time she related it she stated that "she didn't know just what to do." The effect of that statement is also demonstrated by the fact that when she conveyed her real estate a short time later so that the title would be held jointly with defendant, one reason she assigned for doing so was to save probate expense. It is also significant that defendant transported testatrix to the attorney's office and remained in the room while the provisions of the will were being discussed. Another factor which should be considered is that testatrix admittedly had great confidence in defendant and there was testimony that testatrix was a person who "never questioned you if she had confidence in you."

■■ It is also proper to consider the unnatural disposition of the property of testatrix in the will. Gott v. Dennis, 296 Mo. 66, 246 S.W. 218. As heretofore stated, she left one dollar to plaintiff and all the remainder of her estate to defendant, her former daughter-in-law. We recognize that the will contains a statement indicating that testatrix intended that defendant "properly care for" plaintiff and defendant testified that she intended that plaintiff would eventually receive the bulk of the estate. However, the parties seem to have assumed that defendant could not be legally required to pay these assets to plaintiff in accordance with her verbal understanding with testatrix, and we will so assume. In that situation, the jury reasonably could have found that a bequest of one dollar to plaintiff whom, in the words of defendant, testatrix loved "as much as any grandmother ever loved a grandson," was an unnatural disposition of her property.

Defendant received property of the appraised value of $85,000 from Tom's estate. About a month later testatrix signed deeds which resulted in defendant receiving title to testatrix' one-half interest in the Wilhoit real estate upon decedent's death. There was evidence that said interest was valued at $59,000. Assuming the validity of the instant will defendant would receive about $50,000 from that estate. At some time during the period in question a note upon which $50,000 was unpaid (in which testatrix apparently owned a one-half interest) was assigned or in some manner fixed so that it became payable to defendant and

testatrix as joint tenants. In that manner defendant received $25,000 from Mrs. Wilhoit. It therefore appears that in a relatively short period of time instruments were probated or executed from which defendant would receive substantially all of the money or property formerly owned or possessed by Tom and Mrs. Wilhoit. Defendant's admitted promise to both Tom and Mrs. Wilhoit to see that plaintiff was educated and "taken care of" must have influenced each of them in their decision to make defendant the sole legatee (except for the one dollar bequest to plaintiff) of their respective estates. From the foregoing the jury reasonably could have inferred that defendant's activities in connection with the execution of the testatrix' will was part of a general plan or scheme whereby she would obtain all of the property and assets (of the value of more than $200,000) which had been owned by her husband and Mrs. Wilhoit.

In that connection it should be noted that defendant made a will leaving her property to testatrix, and joined in the conveyances which placed her interest in the real estate and note in joint ownership with testatrix so that if she had died first all of her property would have belonged to testatrix. On its face that appears to have been very fair and generous on defendant's part. However, when it is considered that testatrix was 70 years old and in bad health, while it may be inferred from the evidence that defendant was in good health and about 35 years old, it appears to have been highly probable (as actually occurred) that defendant would survive testatrix. The jury could reasonably have inferred that defendant offered to make her will in favor of testatrix in return for like action on the part of testatrix and that such offer was a powerfully persuasive force which (along with other activities) unduly influenced testatrix in the execution of her will.

■ Each of the parties have cited a number of cases which they say support their respective contentions that plaintiff did or did not make a submissible case upon the issue of undue influence. Most of those cases are not helpful because each case must be decided upon its own facts and it is seldom that we find cases involving strongly similar facts. However, we have concluded that the evidence favorable to plaintiff in the case at bar is as strong or stronger than that which was held sufficient to make a submissible case on the issue of undue influence in the cases of Clark v. Powell, supra, and McCormack v. Berking, 365 Mo. 913, 290 S.W.2d 145. As heretofore indicated, we rule that the trial court did not err in overruling defendant's motion for a directed verdict.

■ Defendant contends that the court committed reversible error in giving plaintiff's Instruction No. 7 which reads as follows: "The court instructs the jury that in determining whether the paper writing introduced in evidence as the last will and testament of Julia Wilhoit is, in fact, her last will, or whether the same was procured by undue influence, the jury should take into consideration the reasonableness or unreasonableness of the provisions of said document, and the evidence relating to the age, education, mental condition and business qualifications of the said Julia Wilhoit, the state of her affections toward the different members of her family, the degree of confidence reposed in them, her declarations, if any, regarding the final disposition of her property, the circumstances under which the said document was drafted and executed, the absence of independent, disinterested advice in regard to the final disposition of her property, the relation of confidence, if any, existing between the said Julia Wilhoit and the defendant, Marjorie Baker Fite, and the part, if any, which this defendant, Marjorie Baker Fite, took in procuring the execution of said document, and all the facts and circumstances shown by the evidence; and if from a consideration of all the evidence the jury believe that said paper writing was procured by undue influence as that term is defined in other instructions, the jury will find said document is not the last will and testament of the said Julia Wilhoit." It is

said that the instruction is broader than the evidence in five respects.

The first contention is that the instruction permitted a consideration of the education of testatrix when there was no evidence concerning the extent of her education. Education is a broad term and is not limited to knowledge acquired in the schoolroom. In the case before us there were letters in evidence that had been written by testatrix and there was testimony to the effect that she "wrote a clear hand and maintained an accurate set of records." Those and many other items of evidence tended to show the extent of testatrix' education. The contention is without merit.

The next point in regard to said instruction is stated in defendant's brief as follows: "Said instruction [erroneously] allowed the jury to take into consideration 'her declarations, if any, regarding the final disposition of her property,' for the reason that there was no testimony permitted by the court of any declarations of Julia Wilhoit regarding the final disposition of her property, except for the purpose of showing her state of mind, so there was no competent evidence before the jury of any such declarations." While some of those declarations were admitted for the limited purpose indicated, others were admitted without objection and hence could be considered by the jury without the restriction noted. State ex rel. State Highway Commission v. Williams, Mo.Sup., 289 S.W.2d 64. Moreover, it would seem that the jury could give consideration to those declarations (as authorized by the instruction) even though they may have been admitted for a limited purpose. This point must be disallowed.

The next point briefed in regard to said instruction is that it "was broader than the evidence in that said instruction also allowed the jury to take into consideration 'the absence of independent, disinterested advice in regard to the final disposition of her property,' when in fact the evidence showed that she did have independent, disinterested advice of counsel in the preparation and execution of her will." It is true, as defendant contends, that Mr. William A. Wear testified that he advised Mrs. Wilhoit concerning the provisions of the will after its preparation and prior to execution. Mr. Wear's testimony (offered by defendant) would support a finding that he gave testatrix "independent, disinterested advice." Plaintiff, however, was not bound by that testimony and the jury had a right to disbelieve it. "A jury may believe all of the testimony of any witness or none of it, or may accept it in part and reject it in part; just as the jury finds it to be true or false when considered in relation to the other testimony and the facts and circumstances in a case." Burr v. Singh, 362 Mo. 692, 243 S.W.2d 295, 298. There is no suggestion that any other person gave testatrix "independent, disinterested advice." If the jury rejected the testimony of Mr. Wear as to the manner in which he advised testatrix, it reasonably could have inferred that there was an "absence of independent, disinterested advice in regard to the final disposition of her property." Since the portion of the instruction under consideration was not "broader than the evidence," we rule this contention adversely to defendant.

The fourth contention of error in regard to said instruction is that it "allowed the jury to take into consideration the 'relationship of confidence existing between Julia Wilhoit and the defendant, Marjorie Baker Fite,' without qualifying the meaning of the relationship of confidence, and without having the jury find more than that there was just merely the relationship of confidence between the two." There is no merit in that contention. The provision involved required the jury to find whether there was a relation of confidence existing between testatrix and defendant and if such was found the remaining portions of the instruction required that the jury consider that fact along with all the facts and circumstances in evidence in deciding whether the will was procured by undue influence.

We see nothing improper in that part of the submission.

■ The final complaint against the instruction is that it "allowed the jury to take into consideration 'the part, if any, which this defendant, Marjorie Baker Fite, took in procuring the execution of said document,' when there was no evidence showing that Marjorie Baker Fite took any part in procuring the execution of the document." In our consideration of the question of submissibility we have heretofore stated our view to the effect that evidence was adduced in this case from which the jury could reasonably have found that defendant was active in procuring the execution of the will. It accordingly follows that this contention must be ruled adversely to defendant.

We have limited our consideration of Instruction No. 7 to the specific attacks made thereon by defendant in her "Points Relied On," and in finding that those attacks are not meritorious we are not indicating general approval thereof or recommending it for future use.

■ Under Point No. III in defendant's brief six instances are detailed in which it is contended that the court erred in the admission of evidence offered by plaintiff. The first complaint relates to the admission of the following testimony by Roy Wilhoit: "Q. Tell the jury whether or not Mrs. Wilhoit was a woman who was easily influenced. Mr. Sam Wear: That would be a conclusion, if the court please, and we object to it for that reason. The Court: Well, he can tell what he knows; the objection will be overruled. The witness: Mrs. Wilhoit was a person that, if she had confidence in you, never questioned you. When I was managing the estate, for example, I could take a paper—didn't make any difference what it was—and say, 'There it is,' and she would believe me, and she would sign it, if I told her to sign it." Neither party has cited any case which directly relates to the admissibility of that evidence. However, we note that it is a common prac-

tice in cases of this kind to permit testimony to the effect that the testator is "strong-willed" or has a "strong mind." See Larkin v. Larkin, Mo.Sup., 119 S.W.2d 351 [13]. "Witnesses have been permitted to testify as to mental condition; strength of will; whether one was firm or weak in his decisions * * *." 32 C.J.S. Evidence § 471(f), p. 115. However, we are of the view that a lay witness should not be permitted to express an opinion or conclusion on the question as to whether a person may be easily influenced and for that reason we think that the objection to the question asked should have been sustained. However, we do not think the answer discloses any prejudicial error. The witness had managed testatrix' business for several years after her husband died and was relating facts of which he had personal knowledge rather than stating a conclusion or opinion.

■ Defendant also complains of the admission in evidence of certain letters written by testatrix to plaintiff's mother after the will was executed. Since these letters were admitted without objection defendant is in no position to urge error in that respect upon this appeal. It is also contended that the court erred in permitting testimony by Mrs. Morris, as follows:

"Q. Tell us what she told you at that time. * * *

"By Mr. William Wear: I object to any testimony that occurred after June 6, 1952.

"By Mr. Sam Wear: And for the further reason it is hearsay. * * *

"A. She told me she had been to town that afternoon * * * and that she had had her will made, and that she was going to—that she had taken care of Mike.

"Q. How did she say she had taken care of him? A. She told me she had set up a trust fund for him—.

"By Mr. Sam Wear: We object to that for the same reason, and ask it be stricken because it was after the will was made, according to her testimony.

"The Court: Well, it will be overruled."

We do not think the court erred in admitting that testimony. While those statements of the testatrix were hearsay and were not admissible as proof of the facts stated therein, they were admissible for the purpose of tending to show the confused and befuddled state of mind of testatrix at the time she made the will and it was proper for the jury to consider that evidence upon the issue of undue influence. McCormack v. Berking, supra.

■ Defendant contends that plaintiff was not competent to testify because of the provisions of the so-called "Dead Man's Statute," Section 491.010 RSMo 1949, V.A.M.S. In ruling a similar contention we stated that "A legatee is not a party to a contract and may testify on questions of undue influence and of mental capacity. See 70 C.J. 280, sec. 356; Paris v. Erisman, Mo.Sup., 300 S.W. 487, loc. cit. 489(1)." Norris v. Bristow, 358 Mo. 1177, 219 S.W.2d 367, 371, 11 A.L.R.2d 725. We rule that plaintiff was not disqualified as a witness. There is also no merit in defendant's contention that Roy Wilhoit was disqualified as a witness under said statute. He was a nominal party plaintiff in the capacity as guardian of plaintiff. He was not a legatee or heir and was not personally claiming anything from decedent's estate. We see no reason for disqualifying Mr. Wilhoit and none is suggested except that he is guardian of plaintiff. If plaintiff is not disqualified it would seem clear that his guardian would not be. We rule that said witness was not rendered incompetent by the provisions of the statute in question.

■ Defendant also contends that the court erred in permitting plaintiff to show that slightly more than a month after the execution of the will testatrix and defendant executed deeds conveying the Wilhoit real estate to a straw party who thereafter conveyed it back to them as joint tenants with right of survivorship. We are of the opinion that said evidence was relevant and admissible. It tended to show a general plan on the part of defendant to obtain title to all of the property and assets of testatrix. Moreover, the evidence also tended to show the continuing relationship between testatrix and defendant. See Sittig v. Kersting, 284 Mo. 143, 223 S.W. 742 [5], and Gott v. Dennis, supra, 296 Mo. 66, 246 S.W. 218 [12].

■ It is also said that the court erred in admitting in evidence the inventory and appraisal filed in Tom Wilhoit's estate. We need not determine whether that instrument was, in fact, admissible, because we are of the opinion that, in any event, its admission was not prejudicial. This for the reason that defendant's witness, William Wear, had already testified that defendant had "got all of Tom's estate" which he said was $85,000 or over. Also, defendant testified as follows: "Q. All right, now, you have told your counsel that you inherited Tom's estate; I will ask you if that amounted to $85,464.82, as appraised? A. Yes, sir." This assignment is overruled.

■ Defendant's final contention is that "the court erred in refusing to admit into evidence the letter from plaintiff's mother written to Julia Wilhoit, the testatrix, in which plaintiff's mother stated that the Social Security arrangement was agreeable with her and that she could quit sending the $40.00 per month which she had previously sent, and in refusing to admit the envelope in which said letter was mailed and on which Julia Wilhoit had written 'save this letter,' for the reason that plaintiff's mother testified that she had always gotten along well with Julia Wilhoit and that they had never had any difficulty. Said letter tended to impeach that testimony, as well as corroberate the testimony that one of the reasons Julia Wilhoit had had her will drawn in the manner in which it was drawn was to keep plaintiff's mother from ever getting any of the property or money." We do not think the court erred in sustaining the objection to those exhibits. We see nothing in either exhibit which would tend to prove that there had been any dif-

ficulty between testatrix and plaintiff's mother, nor do they corroborate the testimony to the effect that testatrix didn't want plaintiff's mother to have any of the money. The exhibits, being immaterial for any purpose for which they were offered, were properly excluded.

The judgment is affirmed.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.