JACKSON COUNTY, Missouri, Appellant,

v.

Harvey E. MEYER and Pollyann Meyer, Respondents.

No. 48780.

Supreme Court of Missouri,

Division No. 2.

May 14, 1962.

Cornelius Costello, County Counselor, Jackson County, Kansas City, and Walter A. Raymond, Sp. Asst. County Counselor, Jackson County, Kansas City, for appellant Jackson County, Mo.

Johnson, Lucas, Bush & Vardeman, Hilary A. Bush, Kansas City, and Meyer, Smith & Shute, George W. Meyer, Kansas City, for respondents Harvey E. Meyer and Pollyann Meyer.

STORCKMAN, Judge.

This is a proceeding by Jackson County for the condemnation of land on which to impound a body of water to be known as Lake Jacomo, and in connection therewith to establish public parks and playgrounds.

The tract with which we are here concerned was an improved farm of 195 acres owned by the defendants, Harvey E. Meyer and Pollyann Meyer, his wife. The commissioners assessed the defendants' damages at $75,000 to which report the defendants excepted. Upon a trial of the issue of damages in the circuit court, a jury assessed the defendants' damages at $122,500 and judgment was rendered accordingly. On this appeal the plaintiff complains of the admission of evidence as to the value of other lands in the vicinity and of the defendants' argument to the jury; also that the verdict is grossly excessive and the result of prejudice on the part of the jury.

The defendants' farm was located 7½ miles northeast of Lee's Summit, 3½ miles from Blue Springs, 1½ miles south of Highway 40, and 13 miles from Kansas City. It fronted on a concrete highway known as Woods Chapel Road; Jasper Bell Road, of black-top construction, ran along another side of the farm. The property was on a mail and school bus route and had available and made use of these utilities—city water, electricity, gas, and telephone. The defendants acquired the property about 1942 and lived there continuously until it was taken by condemnation in 1955. Mr. Meyer farmed the land until about 1950. He cultivated about 100 acres but more tillable land was available. About 60 acres was bottom land in an alluvial valley and the soil was about 20 feet deep. After 1950 the principal use of the farm was for pasture. The main house in which the Meyers lived was a mansion-type structure in good repair. It was a three-story, ten-room, entirely modern frame house with a full basement and a two-car heated garage. The grounds immediately around the home, consisting of 2.73 acres, were landscaped. The roof of the two-story front porch was supported by Corinthian columns. Other principal improvements were a large barn, a dairy barn, a tenant house, and a chicken house.

The evidence of the defendants was that the land exclusive of improvements was worth $500 per acre for a total land value

of $97,500, and that the improvements, including the mansion house, were worth a maximum of $71,875. On the other hand, the County's witnesses put a maximum value of $33,125 on the land and about $41,875 on the improvements.

Among other assignments of error, the plaintiff charges that the trial court erred in admitting in evidence over its objection the price it paid "for other lands needed for this lake to avoid the risks, expenses and inconveniences of condemnation litigation." The owners deny that the admission of the evidence was error, but further contend that if it were the plaintiff waived the error expressly and also by introducing evidence of the amount paid for other tracts which it had purchased by negotiation with the owners.

■ As a general rule the value of real estate at a particular time may be proved by evidence of voluntary sales of similar property made in the same general locality and not too remote in point of time. State ex rel. State Highway Commission v. Bruening, Mo., 326 S.W.2d 305, 312 [9]; City of St. Louis v. Kisling, Mo., 318 S.W. 2d 221, 226 [9]; In re Armory Site in Kansas City, Mo., 282 S.W.2d 464, 473 [22]; City of St. Louis v. Buselaki, 336 Mo. 693, 80 S.W.2d 853, 856 [5]; 32 C.J.S. Evidence § 593, p. 445; 18 Am.Jur., Eminent Domain, § 351, p. 994.

■ The amount paid by one authorized to condemn the land, however, is generally not admissible as evidence of value because a sale made under threat of condemnation is not likely to be a voluntary one and the sale price may be affected by a desire of one or both of the parties to avoid litigation. Kansas City v. Thomson, Mo., 208 S.W.2d 216, 219 [2]; City of St. Louis v. Rossi, Mo., 55 S.W.2d 946, 948 [4]; Kansas City & G. Ry. Co. v. Haake, 331 Mo. 429, 53 S.W.2d 891, 895 [12], 84 A.L.R. 1477; Kansas City v. Boruff, 295 Mo. 28, 243 S.W. 167, 169 [1]; Metropolitan Street Ry. Co. v. Walsh, 197 Mo. 392, 94 S.W. 860, 864 [2].

The plaintiff's assertion that these evidentiary rules were violated is not the decisive question on the record before us. In order to demonstrate the context of the controverted proceedings, it will be necessary to set out an inordinate amount of the record. Italics will be supplied to emphasize the statements particularly relied on by the parties. The occurrences in connection with this point commenced during the defendants' case which was presented prior to the plaintiff's evidence. Albert F. Florence testified that prior to June 1955 he lived on his 160-acre farm four miles south of the Meyer farm which he sold in 1955; he described the improvements on his farm and stated that his was "a little house" compared to the Meyer home. When the witness was asked by defendants' counsel how much he sold his farm for, the following occurred within the presence but without the hearing of the jury:

"MR. TITUS: [counsel for the plaintiff] I want to object to showing what he sold his farm for. It would be incompetent, irrelevant, and immaterial, no bearing on the issues in this case, *no proper foundation having been laid to show it was comparable to this property, and it has not been shown that the land is comparable as there is reference made to the house only.*

"MR. WILLIAMS: [also counsel for the plaintiff] As to what he sold his property for would be incompetent and irrelevant because *it was bought by the County in an effort to avoid litigation.*

"THE COURT: *Of course, that is not the question; objection overruled as to the question.*"

The witness then testified that he sold his 160 acres at $500 per acre for a total of $80,000 which concluded his direct examination. On cross-examination, Mr. Florence was interrogated chiefly as to the character and lay of his land and his knowledge of the Meyer farm and its improvements. In answer to whether there was "a creek that ran down through this prop-

erty", the witness stated: "It didn't touch my place. When the lake was formed, it covered forty acres of the bottom land." This rather indefinite voluntary statement was the first intimation to the uninformed that Mr. Florence's farm had been acquired by the County as a part of the lake site. Still there was no effort by the plaintiff to strike the answer or to develop that the transfer of the witness's land to the County was under a threat of condemnation or other than on an arm's-length basis.

The next episode was during the testimony of defendants' witness, William Schwab, a farmer and landowner in the vicinity of the Meyer farm. He testified that he was familiar with the Meyer farm and its productivity and that in his opinion the value of the land exclusive of improvements was $500 per acre. During cross-examination, plaintiff asked the witness what the land in this vicinity and particularly the Lienweber land sold for in 1955 regardless of whether such land was *"required by the lake or somebody else"* whereupon this occurred: "Q Do you know what it sold for the lake for? A Around $260.00 an acre; that was condemned through the County Court.

"MR. TITUS: [counsel for the plaintiff] If Your Honor please, I would like for you to instruct the witness to answer the questions and not to volunteer information.

"THE COURT: Yes.

"MR. BUSH: [counsel for the defendants] Do I understand that was a condemnation sale?

"MR. WILLIAMS: [counsel for the plaintiff] *That was a negotiated sale, not a condemnation.*

"MR. BUSH: Then, I want to put in all the other sales, what you paid for all these other tracts. They have opened it up, Judge, and I have a right to show all these high prices they paid for these other tracts of adjoining land around here.

"(Whereupon, the following proceedings were had within the presence but without the hearing of the jury:)

"MR. WILLIAMS: Your Honor, *I object to the outburst of counsel in the presence of the jury.*

"THE COURT: Sustained.

"MR. WILLIAMS: *My objection to Mr. Bush's remarks about the high prices paid these other people, is that it is prejudicial to the rights of Jackson County.*

"THE COURT: What is to be introduced in evidence the Court will rule on when it is introduced.

"(Whereupon, the following proceedings were had within the presence of the jury:)

"THE COURT: Members of the jury, disregard Mr. Bush's statements.

"(Whereupon, the following proceedings were had within the presence but without the hearing of the jury:)

"MR. WILLIAMS: I ask the Court to reprimand Mr. Bush.

"THE COURT: Yes, don't do that, Mr. Bush.

"MR. TITUS: I want you to instruct the witness to answer questions and not volunteer information. *All that information was volunteered about the condemnation. I didn't ask him that question.*

"MR. WILLIAMS: Many of these were *negotiated sales* and I have a right to show what they were sold for.

"MR. BUSH: Do I understand that your idea of the law is if they were *negotiated sales* to the County in the course of buying land for this lake bed, I can show that evidence to the jury?

"MR. WILLIAMS: I didn't say *you* could.

"THE COURT: I think you can. If the property sold under some forced sale by condemnation, that is another thing.

"MR. BUSH: My understanding has always been if you start under a threat of condemnation—

"THE COURT: (interrupting) He volunteered about the condemnation. The question was direct and he stated he knew the prices."

This concluded the cross-examination and, on redirect, Mr. Schwab testified without objection from the plaintiff that his land and the Oglevie land were sold by "negotiated sale" and he was permitted without objection to state the purchase price. This concluded the defendants' case in chief. Plaintiff's first witness, Russell V. Baltis, a real estate appraiser testified that he inspected the Meyer farm and improvements; that he valued 50 acres at $150 per acre, 60 acres at $250 per acre and 85 acres at $125 per acre for a total value of $33,125 for the land; that the value of the improvements was about $41,875 and that the total value of the land and improvements was $75,000. Thereafter the following then occurred during direct examination by plaintiff's counsel: "Q Did you know what any of this other property sold for that was in this immediate adjoining vicinity? A Oh, yes.

"(Whereupon, the following proceedings were had within the presence but without the hearing of the jury:)

"MR. BUSH: If the Court please, at this time he is asking for land in the immediate vicinity, and *I ask that all sales of property sold by negotiated sale to Jackson County at or about the time they were acquiring this lake site and the threat of condemnation was laying in the background, be excluded.*

"MR. TITUS: Your Honor, he has gone into it himself. He asked the witness himself before he closed his case the very same questions.

"THE COURT: There wasn't even any objection to your question, Mr. Bush.

"MR. BUSH: I objected to it, it is in the record, and you overruled my objec-

tion, so to protect myself I had to put in one sale. Now, I am renewing my objection.

"MR. WILLIAMS: *We are perfectly willing that the jury know what we paid for that land on the negotiated sale. I objected to his speech.*

"THE COURT: Yes, it was what you had to say in the way of an argument about the matter. You can show any *negotiated sale.*"

The witness then testified that the Florence tract was the "highest developed property on the entire lake"; that he valued the land at $250 per acre and the improvements at $38,637 for a total value of $80,-000. The plaintiff then put in evidence the negotiated sale price of other tracts all at a less amount than the Florence tract. Without further objection, the plaintiff's next witness, Charles L. Stroud, also testified to the negotiated sales price of other tracts of land acquired by the County for the lake site.

The ground now urged by the plaintiff in support of its objection is Mr. Williams' statement that the Florence land "was bought by the County in an effort to avoid litigation." At that time there was nothing in the record to show that the Florence land was acquired as a part of the lake site under a threat of condemnation. In its reply brief, the plaintiff asserts that Mr. Williams was the county counselor and "was in a position to know whereof he spoke and his statement was accepted as the fact by the court and defense counsel without question." Nevertheless, we are bound by the record and cannot speculate as to what the court and counsel knew dehors the record. It is incumbent upon the complaining party to make known to the court his "objection to the action of the court and his grounds therefor". S.Ct. Rule 79.-01, V.A.M.R. So far as disclosed by the record at the time of the objection, the litigation may have been potential only and unknown to Mr. Florence. After it became apparent that the Florence land was subject

to condemnation as a part of the lake site, the plaintiff sought no further relief. The trial court cannot now be convicted of error because evidence was subsequently admitted which would have required a different ruling if it had been before the court when the ruling was made. Gough v. General Box Co., Mo., 302 S.W.2d 884, 888 [6]; Williams v. St. Louis Public Service Co., 363 Mo. 625, 253 S.W.2d 97, 104 [11].

██ The record does not bear out the plaintiff's contention that it was forced to offer evidence of negotiated sales of other tracts by reason of the adverse ruling of the court in admitting the testimony of Mr. Florence. On the contrary it appears that the plaintiff voluntarily adopted the evidentiary theory that it was entitled to introduce evidence of the purchase price of *negotiated sales* of other property acquired for the lake site. This evidence was generally favorable to plaintiff's position and there was no suggestion that it was being offered as a result of an adverse ruling. The plaintiff insisted that the amount paid for the Lienweber tract was admissible because it was "a negotiated sale, not a condemnation". In arguing plaintiff's objection to this kind of evidence, plaintiff's counsel stated his theory in this fashion: "Many of these were negotiated sales and I have a right to show what they were sold for". Thereafter in explaining his objection to a "speech" by defendants' counsel, the plaintiff made its position quite clear in stating that: "We are perfectly willing that the jury know what we paid for that land on the negotiated sale". Where a party voluntarily accepts an evidentiary theory tendered by his adversary and offers evidence of the same kind and character, he waives his right to assert on appeal that his opponent's evidence was erroneously admitted. Bowyer v. Te-Co, Inc., Mo., 310 S.W.2d 892, 895 [1]; Clark v. Powell, 351 Mo. 1121, 175 S.W.2d 842, 847 [9]; Pratt v. Missouri Pac. Ry. Co., 139 Mo.App. 502, 122 S.W. 1125, 1128 [9]; Ham v. St. Louis & S. F. R. Co., 136 Mo.App. 17, 117 S.W. 108, 110 [5].

This case is wholly unlike Taylor v. K. C. Southern Ry. Co., Mo., 293 S.W.2d 894, 898 [3], cited by plaintiff in which case the trial court over the defendant's seasonable and proper objection permitted the plaintiff to introduce proof of an issue not pleaded; this court held that the defendant did not waive its objection by offering evidence on the foreign issue thus injected into the case. This and other authorities cited by the plaintiff are not controlling on the facts of this case. The assignment of error is denied.

██ Next the plaintiff asserts that the trial court erred in refusing to declare a mistrial because of improper, inflammatory and prejudicial jury argument by the defense counsel. The argument concerned the failure of plaintiff's appraiser, Charles L. Stroud, to bring with him the records of his appraisals of other land acquired for the lake site. His failure to bring his records to court was first brought to light by the plaintiff during the witness's direct examination. After establishing by the witness that Mr. Dow, an adjoining landowner, "was most agreeable and pleased with the acceptance of $250.00 an acre for his land", the plaintiff asked the witness to give the different values that he "placed on different component parts of" the Dow land. The witness answered that he didn't have the Dow file with him and it was developed that the only file that he had brought along was the Meyer file. Mr. Stroud also testified on direct examination concerning his appraisal of and the amount paid by the County for the Oglevie tract, but again could not give complete information because he did not have his file on the Oglevie property. On cross-examination it was brought out that Mr. Stroud was paid to make the appraisals and to prepare to testify as an expert and that he brought to court the records he was asked to bring. Defendants' counsel asked for an adjournment until the witness brought in his records, but Mr. Stroud said he had "other things to do" and could not get back until the next day, whereupon the parties agreed

in the interest of saving time not to wait for the records.

The plaintiff complains of two references during the defendants' closing argument. One occurred while defendants' counsel was commenting upon the failure of the witness Stroud to bring in his personal records showing the valuation placed upon the buildings and land where he had negotiated sales of the property to the County. The plaintiff's objection was that "they are public records equally available to" defendants' counsel, and this objection was overruled. Defendants' counsel then continued his argument calling attention to the fact that the records were at the witness's office, stating that Mr. Stroud was a hired witness who knew something about how to try a lawsuit and drawing the inference that the witness did not want to disclose the price paid for the adjoining property. The following uncompleted sentence was interrupted by an objection: "Certainly, when a great governmental agency like Jackson County, Missouri, one of the richest counties in Missouri, when it comes out—". Plaintiff's objection on the ground that "it is extremely prejudicial to talk about how rich the County is" was sustained, but the County's motion to discharge the jury was overruled.

Plaintiff's first contention is that the defendants had no right to comment upon the failure of the witness to have his records in court, saying that the burden of proof was on the defendants and the plaintiff was under no compulsion to produce any evidence. This is quite beside the point because the plaintiff was in the process of offering evidence at the time of the occurrence. The plaintiff put the witness Stroud on the stand and it was his inability to answer questions because he did not have his work sheets or reports with him that provoked the incident on which the argument was based. The cases cited by plaintiff holding that an unfavorable inference cannot be drawn from failure to produce a witness that is equally available to both parties are not applicable where the witness is on the stand but has failed to bring essential records with him. It is quite clear that the trial court did not err in overruling the objection to the argument which drew an unfavorable inference from the failure of the witness to have his records with him.

The argument about Jackson County being "one of the richest counties in Missouri" was not completed because of the interruption by the objection, but from the context it is fairly inferable that defendants' counsel was talking of the financial ability of the County to bring in witnesses and their records. The objection was sustained, but the motion to discharge the jury was overruled. When the trial court does not consider improper remarks in argument to be of sufficient importance to grant a mistrial, the appellate courts will defer to the trial court's ruling unless it appears from the record that the improper argument affected the result on the merits and that the trial court abused its discretion in failing to grant a new trial. Collins v. Cowger, Mo., 283 S.W.2d 554, 561 [9]. The record clearly indicates that the trial court did not abuse its discretion in these circumstances. For a similar ruling in a more aggravated case, see State ex rel. Highway Commission of Missouri v. Cone, Mo., 338 S.W.2d 22. No other or intermediate relief was requested. The assignment of error is denied.

The remaining three points presented by the plaintiff are related. They have for their central theme the contention that the judgment should be reversed and the cause remanded for a retrial on the issue of damages because the verdict is grossly excessive. Since the right of the County to condemn the property was not contested, the only issue in the case was the amount of just compensation. In urging these points, the plaintiff reiterates occurrences previously presented and ruled adversely to it. Repetition of these matters does not entitle the plaintiff to a reconsideration since the relief requested is in essence the same.

■ The first contention in this group is that the trial court permitted a trial atmosphere to develop which was hostile to the plaintiff because the County was taking the property by condemnation against the will of the defendants and that this hostile atmosphere resulted in an award of compensation in excess of the reasonable market value of the property. The plaintiff specifies approximately a dozen trial incidents in support of this contention. We find no justification for the plaintiff's conclusion that the jury or court was hostile to it or that it was denied a fair trial. Recital of a few of the incidents complained of will demonstrate their character. Three of them occurred during the impaneling of the jury. The incidents were not substantial, but if they were the plaintiff would be in no position to complain of them because the parties thereafter stipulated that neither had any objection to the jury as constituted. While testifying, Mr. Meyer lost control of his emotions and sobbed; it was past recess time and the court adjourned. The plaintiff made nothing of the occurrence at the time and, without more, such an incident is not considered prejudicial. Garrison v. Ryno, Mo., 328 S.W.2d 557, 568 [16]; Petty v. Kansas City Public Service Co., 355 Mo. 824, 198 S.W.2d 684, 689 [10]. A couple of the specifications deal with the refusal of Mr. Meyer to produce his income tax records pursuant to plaintiff's request made during the trial. The records were requested first on the ground of showing the depreciation taken by Mr. Meyer on the farm improvements and then to show his income when he was farming the land which was prior to 1950. Certainly, the court did not abuse its discretion in refusing to grant a mistrial so that the plaintiff could take measures to have these returns produced for examination. The request was not timely. See State ex rel. Boswell v. Curtis, Mo.App., 334 S.W.2d 757. Furthermore, the depreciation allowed for income tax purposes does not necessarily fix or determine reasonable market value. Then, too, the most valuable improvement by far was

the Meyer home, and a farm dwelling occupied by the owner is not recognized as a depreciable capital asset. 4 Mertens, Law of Federal Income Taxation, §§ 23.53 and 23.54; C.C.H. '62, Federal Income Tax, Vol. 2, § 167, ¶ 1724.1701. Even considering the income that might be shown for the years prior to 1950, there was no prospect that the returns would have an important bearing on the determination of market value. The admission of the evidence of other sales of land and defendants' jury argument, both of which have been considered and disposed of previously, are mentioned again in this connection. None of the other incidents mentioned under this point were brought to the attention of the trial court in the motion for new trial. See S.Ct. Rule 79.03. Nevertheless, the events depended on did not separately or in the aggregate deny the plaintiff a fair trial; it is not entitled to a perfect one. State v. Turner, Mo., 353 S.W.2d 602, 605 [9].

■ The final two points in plaintiff's brief are substantially the same and can be considered together. One charges that the verdict is so grossly excessive as to demonstrate bias and prejudice requiring the grant of a new trial or a large remittitur; the other asserts that the "cumulative effect of the prejudicial matter brought to the attention of the jury by defendants and the errors committed should shock the judicial sense of right and create a firm conviction in the mind of this court that the ends of justice will be best served by reversing and remanding this case for a new trial on the issue of damages."

As the statements of these points indicate, the plaintiff undertakes to rehash matters already disposed of, such as incompetent evidence of value, bias and prejudice of the jury resulting from the "prejudicial trial atmosphere built up against it by defendants", the defendants' closing argument to the jury, and Mr. Meyer's emotional behavior. We have held that these matters did not deprive the plaintiff of a fair trial and nothing is added here that causes us to

change our conclusion. The trial was by no means one-sided. Neither the plaintiff's witnesses nor the plaintiff's counsel overlooked any opportunity to put their case before the jury in the light most favorable to them. If the verdict had been unfavorable to the defendants, they would probably have been in a position to make complaints similar to those now made by the plaintiff. In these circumstances, all that remains to be considered is whether the verdict is supported by substantial evidence.

As previously indicated, there was competent and substantial evidence by Mr. Meyer and other witnesses that the land itself was reasonably worth $97,500 and that the mansion house alone had a reasonable value of $64,000 for a total value of the land and improvements of $161,500. Even the plaintiff's witnesses testified that the "property was in good condition", the house was "a good house", and was "in good repair"; it was "a very excellent house" according to another witness. Mr. William L. Landahl, the director of County Parks, one of plaintiff's witnesses, testified that he was living in the mansion house which the County furnished to him rent free as his private residence; all other improvements had been removed from the land. Mr. Stroud testified that "Mr. Meyer had some very good, fertile bottom land that the Oglevie acreage

did not have". The photographs in evidence bear out these and other descriptions of the land and its improvements. The location of the land as previously described also contributed to the value of the property. While the verdict of $122,500 is substantial, the amount is neither shocking nor surprising in view of the record and exhibits before us. The jury's award of damages is supported by substantial evidence and we have no valid reason to interfere with it. City of St. Louis v. Vasquez, Mo., 341 S.W. 2d 839, 852 [31, 32]; Taney County v. Addington, Mo., 304 S.W.2d 842, 843 [3]; Prairie Pipe Line Co. v. Shipp, 305 Mo. 663, 267 S.W. 647, 649 [4].

In discussing the Vasquez case, the plaintiff stated that this court "ordered a substantial remittitur from the jury's award". This statement is incorrect and completely misleading. The remittitur required was that of interest erroneously added by the trial court to the amount of the verdict; the *jury's award of damages* was left intact because it was supported by substantial evidence. 341 S.W.2d pp. 847 and 852.

We have considered all of the appellant's assignments of error and find them to be without merit. Accordingly the judgment is affirmed.

All of the Judges concur.